## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY KAMARA,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF BOSTON; and ROBERT AHEARN, BENJAMIN DAVIS, JAMES DOYLE, DANIEL FLYNN, DENNIS HARRIS, TIMOTHY MURRAY, HERBERT SPELLMAN, ROBERT TINLAN, *in their individual capacities*,<br><br>        Defendants. | Civil Action No. 26-cv-11161<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT AND JURY DEMAND</u>

Barry Kamara, by and through his attorneys, the law firm Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, and attorneys John J. Barter, Esq., and Amy M. Belger, Esq., alleges as follows:

1.  Mr. Kamara was only 17 years old when he was arrested for a crime he didn't commit and had nothing to do with: the May 16, 1991, murder of Ronald Taylor in Dorchester, Massachusetts.

2.  Mr. Kamara spent nearly eighteen years wrongfully incarcerated, and then almost fourteen years wrongfully subject to restrictive parole conditions.

3.  Mr. Kamara's wrongful conviction was no accident: he was framed by officers from the Boston Police Department ("BPD"). Those officers are Defendants here.

4.  We now know that Defendants knew Mr. Kamara was innocent, but pursued him anyway.

5.  From internal BPD documents, we now know that Defendants were set on convicting Mr. Kamara of a murder, *any* murder.

1

6.  The true killer was John Doe.[1] Because Defendants framed Mr. Kamara, instead of pursuing the true killer, John Doe remained free, and went on to commit many more crimes, including at least one additional murder.

7.  Defendants framed Mr. Kamara by fabricating false eyewitness identifications, engaging in improperly suggestive identification procedures, burying exculpatory evidence, and fabricating evidence to falsely undermine other exculpatory evidence.

8.  As one example, Defendants used improper suggestion, pressure, and coercion to fabricate false eyewitness identifications from two people who barely had a chance to see Taylor's killer and who told Defendants they would be unable to identify the killer.

9.  As another example, Defendants withheld evidence provided by the victim's own mother, which pointed to another person as being involved in her son's murder.

10. Defendants acted pursuant to the BPD's policies, patterns, practices, and customs in effect at the time; and they acted in accordance with the BPD's deliberately indifferent failure to train, supervise, and discipline its employees.

11. Defendants engaged in such egregious misconduct because they knew they could get away with it, due to the BPD's longstanding policies, patterns, practices, and customs of looking the other way when officers engaged in misconduct. That specifically includes the BPD's well-known practice of "whitewashing" internal investigations into officer misconduct, and letting officers and detectives off the hook with slaps on the wrist or no discipline at all, even when they engaged in serious misconduct.

12. Mr. Kamara never stopped fighting to prove his innocence.

---

[1] "John Doe" is a pseudonym. The killer is a known, specific person. For safety reasons, we are not using his real name in this publicly filed document.

13. In 2021, Mr. Kamara learned about the exoneration of another wrongfully convicted man, Robert Foxworth. Foxworth's wrongful prosecution and conviction happened within weeks of Mr. Kamara's, and the lead detective on the cases was the same: Defendant Daniel Flynn.

14. Upon learning that Foxworth had been framed, Mr. Kamara requested that counsel be appointed for him by the Committee for Public Counsel Services to look into his convictions. Attorney Amy M. Belger was appointed to handle the case.

15. Belger submitted Mr. Kamara's case to the Integrity Review Bureau of the Suffolk County District Attorney's Office (IRB) for review, and the case was immediately accepted due to its striking resemblance to the Foxworth case. The IRB turned over some documents from the BPD's case file and Mr. Kamara saw that the BPD possessed substantial exculpatory and impeachment evidence that had been unconstitutionally suppressed. He promptly moved to set aside his convictions.

16. The Commonwealth of Massachusetts (acting through the Suffolk County District Attorney) agreed that Mr. Kamara's convictions could not stand. The Commonwealth admitted that "significant *Brady* materials" had been withheld from Mr. Kamara "and that Mr. Kamara was prejudiced by this non-disclosure."

17. Thirty-one years after being wrongfully convicted, Mr. Kamara's convictions were vacated, by an Order of the Suffolk Superior Court, and the charges against him were nolle prossed at the request of the Office of the Suffolk County District Attorney.

18. Then, in a separate civil proceeding, Mr. Kamara sought compensation based on clear and convincing evidence of his actual innocence. The Office of the Massachusetts Attorney General, after a thorough examination of the record, settled that case for the maximum amount permitted by statute, and the Suffolk County Superior Court entered an Order expunging the

wrongful conviction from Mr. Kamara's record and ordering that the now-vacated conviction may not be used against Mr. Kamara in any future proceedings in which he is a party.

19. Mr. Kamara brings this civil-rights lawsuit to hold accountable the actors who caused his wrongful conviction: the City of Boston and the individual Defendants (Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan).

## JURISDICTION AND VENUE

20. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Kamara's rights as secured by the United States Constitution.

21. This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over Mr. Kamara's state-law claims pursuant to 28 U.S.C. § 1367(a).

22. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

23. Mr. Kamara respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

24. Mr. Kamara has complied with the requirements of the Massachusetts Tort Claims Act, Mass. Gen. Laws c. 258 § 1, *et seq*. Mr. Kamara served the Mayor of the City of Boston, and Corporation Counsel with presentment letters dated January 10, 2024, pursuant to Mass. Gen. Laws c. 258, § 4. As of the date of this filing, Mr. Kamara has not received any response.

## PARTIES

25. Plaintiff Barry Kamara is 52 years old and lives in Massachusetts. Mr. Kamara was wrongfully incarcerated from his arrest on May 24, 1991, until his release to the community on lifetime parole on May 6, 2009. He spent nearly fourteen years on parole, unfairly living with the

4

stigma of a murder conviction, until his convictions were vacated and the charges against him were dropped on March 22, 2023.

26. Defendant City of Boston ("City") is a municipality of the Commonwealth of Massachusetts, which oversees the BPD. At all relevant times, the City was responsible for the policies, patterns, practices, and customs of the BPD. The City is additionally responsible for certain acts of each of the individual Defendants taken while they were employed by the City and while acting under color of state law and within the scope of their employment. At all relevant times, the individual Defendants were employed by or acting as agents of the City and the BPD while engaging in the conduct described in this Complaint.

27. At all relevant times, Defendant Robert Ahearn was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws c. 190B, § 3-803(d)(2).

28. At all relevant times, Defendant Benjamin Davis was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws c. 190B, § 3-803(d)(2).

29. At all relevant times, Defendant James Doyle was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon

information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30. At all relevant times, Defendant Daniel Flynn was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws c. 190B, § 3-803(d)(2).

31. At all relevant times, Defendant Dennis Harris was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

32. At all relevant times, Defendant Timothy Murray was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

33. At all relevant times, Defendant Herbert Spellman was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

34. At all relevant times, Defendant Robert Tinlan was employed by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and pursuant to Mass. Gen. Laws c. 190B, § 3-803(d)(2).

## FACTUAL ALLEGATIONS

### Ronald Taylor is killed.

35. On May 16, 1991, around 5:30 p.m., 19-year-old Ronald Taylor, accompanied by his friends, Corey Harris[2] and Claude McClinton, walked to a bus stop on Dakota Street in the Dorchester neighborhood of Boston, Massachusetts. He planned to meet another friend, Tiara Walden, and then take the bus to an evening class.

36. But at the bus stop, a gunman—wearing a hat very low to hide his face—approached and fired several shots, hitting Taylor.

37. Corey Harris asked Taylor if he recognized his shooter, and Taylor said no.

38. Tragically, Taylor died from his injuries.

39. The witnesses were: Corey Harris and McClinton, who were with Taylor when he was shot; Tiara Walden, whom the shooter passed on the sidewalk a few minutes before opening fire; and a neighborhood resident named Angela Larkins, who ran to her door when she heard shots.

### Mr. Kamara is innocent.

40. Mr. Kamara is completely, factually innocent of the Taylor murder. He was not involved in any way.

---

[2] We use Corey Harris's full name throughout, to distinguish him from Defendant Harris.

41. Consistent with Mr. Kamara's innocence, no physical or forensic evidence ever tied him to the crime.

42. Mr. Kamara, at 5'5" to 5'6", was much shorter than the shooter. On the day of the shooting, McClinton described the shooter as 5'9", and Walden described him—in an interview with Defendant Harris—as 5'10". These descriptions were highly accurate, as both witnesses saw the shooter at close range and described someone very close to their own height (McClinton was about 5'8" and Walden was about 5'10"). Walden specifically described the shooter as being about the same height as she was. Corey Harris, who later saw Mr. Kamara up close, has given a sworn statement that Mr. Kamara is *much* shorter than the shooter.

43. The true perpetrator was Brandon Clark. He was—just as McClinton and Walden described—about 5'9" to 5'10" at the time of the shooting.

44. John Doe has confessed to Taylor's murder.

45. Over the years, John Doe demonstrated consciousness of guilt for Mr. Kamara's wrongful incarceration. Without solicitation, he sent money to Mr. Kamara's prison account and sent letters apologizing for the fact that Mr. Kamara was wrongfully incarcerated for John Doe's crime.

46. In 2021, when Mr. Kamara sought to overturn his wrongful conviction, he had already been out of prison for more than twelve years, and his conditions of parole had, over time, gotten less restrictive. Asking for a new trial carried substantial risk: a new trial could mean another wrongful conviction and a return to prison. Nevertheless, Mr. Kamara knew he was innocent and cared deeply about clearing his name.

47. After Mr. Kamara's convictions were overturned and the charges were dismissed, the Commonwealth paid the maximum amount permitted by statute to settle the claim Mr. Kamara

brought under Mass. Gen. Laws c. 258D, a claim that requires clear and convincing evidence of innocence.

**Defendants fabricate incriminating evidence and suppress
exculpatory and impeachment evidence.**

48. As mentioned, McClinton and Walden had seen the shooter up close, and had reliably described the shooter as 5'9" or 5'10".

49. And the witnesses were all able to describe the shooter's clothes.

50. But when it came to the shooter's *face*, none of the witnesses provided a description.

51. Defendants knew the witnesses would be unable to provide a reliable identification of the shooter, for several reasons:

    a. The shooter hid his face by wearing a hat pulled down very low.

    b. The witnesses saw the shooter's face only very briefly (less than two seconds for Walden, and a matter of mere seconds for the others).

    c. Larkins saw the shooter from across the street and focused her attention on the gun. She was so far away that she mistook the shooter's baseball cap for a wool, winter-style hat. She told Defendants she didn't get close enough to see the shooter's face.

    d. Walden saw the man about three minutes *before* the shooting (which she did not know was going to happen), so had no reason to pay attention to his features. She told Defendants she did not pay attention to the shooter because she was paying attention to the 18-month-old child under her care. She told Defendants she "only glanced" at the shooter and would not be able to make an identification.

    e. McClinton and Corey Harris would have been distracted by the gun and impaired by the high-stress scenario. They told Defendants they only saw the shooter's lips and chin.

52. Nevertheless, consistent with improper BPD customs at the time, Defendants repeatedly showed the witnesses photos and attempted to procure identifications.

53. No witness made a true, independent identification of Mr. Kamara.

54. Larkins and Corey Harris never identified Mr. Kamara at all.

    a. Corey Harris was shown a photo array that included Mr. Kamara's photo, but he did not identify Mr. Kamara or anyone else.

    b. Larkins was subjected to two identification procedures, at least one of which included a photo of Mr. Kamara, but she never identified him or anyone.

55. On the day of the shooting, Walden reminded Defendants that she did not get a good enough look at the shooter's face to identify him. Defendants nonetheless had her look at numerous photos to try to make an identification. She picked out photos of two different men, neither one of them Mr. Kamara. She said that G.G., the person depicted in one of the photos she chose, "looks like" the shooter.

56. On the day of the shooting, McClinton picked out a photo, not of Mr. Kamara. But he told Defendants he wasn't sure if it was the shooter because he didn't see the shooter's face.

57. By May 18—two days after the shooting—Defendants had absolutely no reason to suspect the innocent Mr. Kamara of involvement in Taylor's murder, or any other murder. There was not one shred of evidence that Mr. Kamara killed Taylor or anyone else, because he didn't.

58. But Mr. Kamara was a young, Black teen, who lived in a high-crime area. Defendants and others at BPD had falsely labeled him a gang member. And Defendants and others at BPD

personally disliked him, because they found him insufficiently deferential and submissive to the police.

59. Recently discovered BPD documents, including documents authored by Defendant Ahearn, show that by May 18, Defendants had decided to target Mr. Kamara, baselessly declaring him their "prime suspect" in a completely different murder (another one Mr. Kamara did not commit and for which there was not a single shred of evidence to the contrary).

60. Defendants were set on convicting Mr. Kamara of murder—*any* murder.

61. As explained next, Defendants were able to, over time, get McClinton to falsely identify the innocent Mr. Kamara as the shooter. Defendants then parlayed that into additional false evidence from Corey Harris and Walden.

*McClinton's Identification*

62. McClinton was subjected to (at least) four identification procedures.

63. In the first procedure (discussed above), and in the second procedure, McClinton picked a photo of a different man, not Mr. Kamara, but made clear to Defendants he was not confident because he only saw the shooter's chin and lips.

64. Defendants—including Defendants Flynn and Ahearn—suppressed those identifications of another man. Defendants—including Defendants Flynn and Ahearn—falsely reported that McClinton never identified anyone until (as discussed next), he identified Mr. Kamara.

65. A few days after the second procedure, Defendants returned to McClinton and subjected him to a third identification procedure. This time, McClinton identified Mr. Kamara. McClinton's inaccurate identification of the innocent Mr. Kamara was procured by Defendants' improper pressure, suggestion, and coercion.

a. The real shooter—John Doe, the man McClinton had actually seen—does not look like Mr. Kamara;

b. John Doe hid his face and McClinton saw him only briefly, and while distracted by John Doe's gun;

c. McClinton would not have accidentally picked the innocent Mr. Kamara, who did not look like John Doe and who happened to be Defendants' target, without Defendants' improper suggestion and pressure.

d. On information and belief, the improper pressure included promising not to pursue charges against McClinton for his own, well-known criminal behavior (for example, on the very day of the shooting, Defendants knew that McClinton had threatened to shoot his own father and had also told Defendants that he would "take care" of Taylor's killer himself).

e. After McClinton went along and identified the innocent Mr. Kamara, Defendants told him that he had picked the right person.

66. Defendants—including Defendants Flynn and Ahearn—falsely reported that McClinton had made a "positive identification" on his own, without any undue suggestion, pressure, or coercion.

67. Defendants soon learned that their choice of Mr. Kamara as their target had at least one glaring problem: he was *much* shorter than John Doe, the true killer whom the eyewitnesses had accurately described as 5'9" or 5'10". Mr. Kamara was about 5'5" to 5'6".

68. To clean up this problem, Defendants—including Defendants Flynn and Ahearn—subjected McClinton to a *fourth* identification procedure. This one took place just a couple days after the third.

    a.   Defendants recorded the fourth procedure, to make it look reliable and true.

    b.   Before Defendants started the recording, they told McClinton to pick the same person he had picked last time (and they used the exact same photo array to make it easy).

    c.   Before Defendants started the recording, they fed McClinton—who did not know Mr. Kamara and therefore did not know how tall he was—the information that Mr. Kamara was about 5'6", so McClinton could regurgitate that information (in a drastic, unexplained change from his initial description of the shooter as 5'9").

    d.   Defendants falsely reported that McClinton independently described the shooter as 5'6", without being fed that information by Defendants and without any improper suggestion or pressure.

69. Given McClinton's very limited ability to see the shooter—only for a brief time, while distracted by a gun, while the shooter was hiding his face—Defendants knew they needed to do more to make McClinton's false evidence seem reliable. So they got McClinton to say he was able to recognize Mr. Kamara because he had seen him one time before. The story was that one time, months before the shooting, Taylor (the victim) had pointed out Mr. Kamara and identified him to McClinton, who then observed Mr. Kamara for a second or two. That was completely fabricated.

    a.   Taylor did not know Mr. Kamara, and Mr. Kamara did not know Taylor.

    b.   And recall, in a dying declaration, Taylor told his friends he did not recognize his shooter.

    c.   After Mr. Kamara was convicted, McClinton told detectives in a recorded phone call that he had never seen the shooter before in his entire life.

*Corey Harris's Description of the Shooter*

70. Even though Corey Harris was immediately known to be a witness, and was a friend of the victim, to this day Mr. Kamara has never been provided any description of the shooter that Corey Harris gave on the day of the shooting.

71. But just minutes after Defendants fed Mr. Kamara's height to McClinton and used improper pressure to get McClinton to regurgitate that information and falsely describe the shooter as 5'6", Defendants—including Defendants Flynn and Ahearn—did the same with Corey Harris. Defendants falsely reported that Corey Harris independently described the shooter as 5'6", without being fed that information by Defendants and without any improper suggestion or pressure. This fabricated description, given six days after the murder, is the earliest description Defendants have ever disclosed from Corey Harris.

72. Because there is no reason for Defendants not to have taken an immediate description from an eyewitness who was a friend of the victim, on information and belief, Defendants suppressed Corey Harris's initial description. Because John Doe, the man Corey Harris actually saw, was 5'9" to 5'10", Corey Harris's initial description—like those of McClinton and Walden—was very likely exculpatory.

73. Corey Harris has since sworn in an affidavit that Mr. Kamara is *much* shorter than the man who killed Taylor.

*Walden's Identification*

74. As previously mentioned, on the day of the shooting, Walden picked two photos—neither one was of Mr. Kamara—and said that G.G. "looks like" the shooter, but also told Defendants she couldn't make a reliable identification, given the circumstances under which she saw the shooter.

14

75. But after Defendants got McClinton to falsely identify the innocent Mr. Kamara and to revise his description of the shooter's height from 5'9" to 5'6", and after Defendants got Corey Harris—six days after the shooting—to describe the shooter as 5'6", Defendants came back to Walden to fabricate additional evidence against Mr. Kamara.

76. At this second identification procedure, which took place weeks after the crime, Defendants showed Walden more photos, including a photo of Mr. Kamara. Walden did not pick Mr. Kamara's photo. Walden again picked two photos, including one of G.G., and told Defendants the shooter had darker skin than G.G. She also reminded Defendants that she couldn't make a reliable identification of the shooter, given the circumstances under which she saw him.

77. Defendants suppressed all evidence that this second identification procedure with Walden ever occurred.

78. Defendants, including Defendants Ahearn and Flynn, took another run at Walden, subjecting her to a third identification procedure. She picked *three* photos: one of G.G., one of Mr. Kamara, and one of another man. Defendants used improper pressure and suggestion to encourage Walden to identify Mr. Kamara as the shooter. Regarding Mr. Kamara, she *asked* Defendants, "is this the guy," meaning "is this the shooter?" She also *asked* Defendants whether Mr. Kamara was "darker than this," meaning darker than depicted in the photo. Defendants told Walden that Mr. Kamara was in fact darker, and she responded that Mr. Kamara then "could" be the shooter. Defendants told Walden, "you got the right guy."

79. Even though Walden had *asked* Defendants whether Mr. Kamara was the shooter, and had never *told* Defendants that Mr. Kamara was the shooter, Defendants instructed her to sign Mr. Kamara's photo—fabricating evidence that Walden had identified Mr. Kamara.

80. The report Defendants—including Defendants Flynn and Ahearn—created about Walden's third identification procedure completely omits the fact that she picked a photo of G.G.; it only mentions her picking a photo of Mr. Kamara. And instead of accurately reporting that she *asked* whether Mr. Kamara was darker than depicted in the photo, it falsely reports that she *told* Defendants that Mr. Kamara was darker.

81. At least one of the three times Walden picked a photo of G.G., she signed the back of the photo. But Defendants have never disclosed that signed photo.

82. On information and belief, Walden suffered from obvious cognitive deficiencies that Defendants realized they could exploit. After fabricating evidence that Walden identified Mr. Kamara in a photo-identification procedure, Defendants, by the time of trial, were able to get her to falsely testify to that story. And to make that story more persuasive, they ran the same play they ran with McClinton, getting Walden to say she had seen Mr. Kamara for a few seconds one time previously, as an explanation for how she could recognize him on the day of the shooting despite the extremely poor viewing conditions.

83. Defendants suppressed the true circumstances—the improper suggestion, pressure, and coercion—of the identification procedures and interviews conducted with McClinton, Corey Harris, and Walden.

*Evidence Pointing to two Alternate Perpetrators*

84. Three days after the murder, the victim's mother provided Defendant Flynn with information that a man named Bernard King was involved in her son's murder. That tip was corroborated by evidence given to Defendants by a teenager named Terrance Bradshaw. Defendants investigated this lead and determined that Bernard King was a gang member— Defendants suspected Taylor's killing was gang related. Indeed, Bernard King was in the same gang as John Doe, the real killer. Defendants suppressed all this exculpatory evidence.

16

85. Taylor had been shot a different time, just three months before he was killed. Defendants had a suspect for that shooting, a man with the initials E.B (who was also a member of John Doe's gang). Defendants deliberately did not investigate E.B. for the Taylor murder. Defendants never showed any of the witnesses a photo of E.B.

86. To falsely tie up this loose end, Defendants—including Defendants Tinlan and Davis—fabricated evidence to undermine the relevance of E.B. Specifically, these Defendants created a report, dated September 16, 1991, stating in substance that *eight months earlier* they had interviewed Taylor and, based on information he provided, had ruled out E.B. as a suspect in Taylor's earlier shooting. That is a pure fabrication: no one from BPD spoke to the shooting victim in February, learned relevant information, and simply kept it a secret for eight months. The conversation never happened.

*Evidence about Related Crimes*

87. Defendants also suppressed evidence about a heated dispute between two youths, which took place two weeks after Taylor was killed, which was motivated by Taylor's killing, and which culminated in one of the youths being stabbed. The evidence suppressed indicated that the youths had information about the motive for Taylor's murder. Defendant Ahearn had specific knowledge about this, as he responded to the stabbing.

88. Defendants also suppressed evidence that one of the youths involved in that stabbing was suspected of having stabbed McClinton months earlier. McClinton's involvement in an ongoing gang dispute related to Taylor's murder—and Defendants' willingness to ignore that involvement—was exculpatory and impeaching, as it could explain McClinton's susceptibility to Defendants' improper suggestion, pressure, and coercion.

*Fabrication to Undermine Mr. Kamara's Alibi*

89. Mr. Kamara had alibi witnesses. With their evidence, the prosecutor likely would not have prosecuted the case, or the jury would have acquitted. Defendants corruptly and falsely undermined them by fabricating police reports about Defendants' interactions with these witnesses. Defendants knew that prosecutors and juries would take Defendants' side over the witnesses' side, especially if Defendants appeared to have contemporaneous reports corroborating their side.

90. For example, Defendants—including Defendants Flynn, Murray, and Harris— fabricated a report stating that alibi witness Lesroy Ryan's account of his time spent with Mr. Kamara on the night of the shooting did not add up; that Ryan's own mother contradicted his account; and that when Defendants pointed out the supposed flaws in the account, Ryan became flustered. None of that was true.

*Defendant Doyle's Admission that Kamara was Being Framed*

91. Defendant Doyle (and perhaps other Defendants) accurately suspected that John Doe killed Taylor. John Doe was a gang member and prolific violent criminal who was active in the exact area where Taylor was killed. Numerous neighborhood residents knew that John Doe was the true killer. Doyle explicitly told people, including youth named James Jones and Sly Brantley, that Defendants were content to prosecute Mr. Kamara and secure his conviction, even though they knew he was innocent.

92. Doyle put the onus for solving Taylor's murder on the youth, telling them that he and others at the BPD would frame Mr. Kamara unless Jones and Brantley provided evidence against John Doe.

93. Jones and Brantley did not provide evidence against John Doe.

94. Defendants suppressed evidence of Doyle's conversation with Jones and Brantley.

95. Defendants suppressed the evidence that caused Doyle to correctly suspect John Doe.

96. When "investigating" Taylor's murder, Defendants never showed a single witness a photo of John Doe.

97. Instead of pursuing the true killer, Doyle joined the other Defendants, proceeded with the plan to frame Mr. Kamara, and allowed the other Defendants to do the same.

*Defendants Acted in Concert*

98. At all times relevant to this Complaint, the individual Defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Mr. Kamara. Each of the individual Defendants—through their regular communications with the other individual Defendants, through their own investigative activities, and through their access to the homicide file which contained the notes and reports prepared throughout the investigation—was aware of the information demonstrating the falsity of the case against Mr. Kamara, including the falsity of the eyewitness identifications. Each of the individual Defendants was likewise aware of the substantial exculpatory and impeachment evidence possessed by the BPD which was not disclosed to Mr. Kamara or the prosecutor. To the extent that an individual Defendant did not affirmatively engage in one or more particular acts of misconduct alleged in this Complaint, that individual Defendant knew of or recklessly disregarded the risk of the other individual Defendants' unlawful actions and omissions throughout the prosecution of Mr. Kamara, yet they failed to act to prevent those actions or omissions from causing harm to Mr. Kamara.

99. Defendant Spellman was the supervisor in charge of the investigation and Defendant Flynn was the lead detective. These two Defendants reviewed and signed off on all police reports created (many of which were addressed to Spellman), and investigative steps taken (many of which were directed by Flynn). They actively supervised the other individual Defendants' actions taken and learned in real time of the information gathered. As the leaders of the case,

Defendants Spellman and Flynn reviewed and approved the investigative materials produced to the prosecutor before trial.

**Mr. Kamara is wrongly convicted based on fabricated and unreliable eyewitness accounts.**

100.    Based on the fabricated eyewitness identifications, Mr. Kamara was arrested on May 24, 1991. No other evidence, including physical or forensic evidence, connected him to the crime. He was indicted on June 7, 1991.

101.    Defendants Flynn and Ahearn used Mr. Kamara's arrest as another opportunity to fabricate evidence against him. Specifically, in their report of the arrest, they claimed they found a .38-caliber bullet in Mr. Kamara's house. That was completely false: neither Mr. Kamara nor anyone who lived in the house ever used guns or ammunition. The closest thing Mr. Kamara possessed—which Defendants did seize—was an ornamental keychain charm, made from an old shell casing. It wasn't a bullet at all, and certainly not a .38-caliber bullet.

   a.  Defendants' fabrication was designed to make it look like Mr. Kamara had access to a .38-caliber weapon and ammunition.

   b.  Based on statements from the victim and a paramedic, Defendants believed that Taylor was killed with a .38-caliber weapon.

   c.  It wasn't until months after Defendants had arrested Mr. Kamara, and fabricated the presence of a .38-caliber bullet in his house, that the bullet recovered during the victim's autopsy was analyzed and determined *not* to be .38 caliber.

102.    From January 14 through January 21, 1992, Mr. Kamara was tried for Taylor's murder.

103.    The case against Mr. Kamara was exceptionally weak, consisting almost entirely of identifications from McClinton and Walden, who admittedly had little opportunity to see the shooter's face.

104.    McClinton's trial testimony was riddled with inconsistencies, including with his prior statements. He repeatedly said the transcripts of his earlier statements must simply be wrong.

105.    Walden had to admit that she had repeatedly picked a photo of a different man (G.G.) and had also told Defendants that she "only glanced" at the shooter, saw his face for less than two seconds, didn't know a shooting was going to happen, and was paying attention to the 18-month-old in her care.

106.    Of course, the false identifications were somewhat bolstered by Defendants' pure fabrication that these witnesses had each seen Mr. Kamara one time before.

107.    Because Defendants had fabricated evidence to undermine Mr. Kamara's alibi, his alibi witnesses were not called, and the jury never learned that he was simply at home watching movies with two friends when Taylor was killed.

108.    Because of Defendants' suppression, the jury never learned that—two days before *anyone* ever identified Mr. Kamara—Defendants had baselessly declared Mr. Kamara to be their "prime suspect" in a completely different murder (another one Mr. Kamara did not commit and for which there was not a single shred of evidence to the contrary). That is, the jury never learned that Defendants were set on convicting Mr. Kamara of a murder—*any* murder.

109.    Because of Defendants' suppression, the jury never heard that McClinton had *twice* identified a different man, before he identified Mr. Kamara.

110.    Because of Defendants' suppression, the jury never heard that McClinton may have been involved in an ongoing dispute with other youths who had information about the motive for Taylor's murder. That suppressed evidence, combined with McClinton's evolving stories, could reasonably have caused the jury to reject McClinton's testimony. McClinton may

have been viewed by the jury as something other than a credible and disinterested civilian eyewitness if jurors knew of his connection to what appears to be gang-related violence.

111.    Because of Defendants' suppression, the jury never heard how Corey Harris described the shooter right after the shooting. The first description from Corey Harris that the jury heard—describing the shooter as 5'6"—was from six days after the crime, only *after* Defendants had fed it to McClinton and Corey Harris and had pressured them into regurgitating it.

112.    Because of Defendants' suppression, the jury never learned that Taylor's mother had provided information to Defendants, including Defendant Flynn, that Bernard King—a member of John Doe's gang—was involved in her son's murder. And the jury never learned that that information was corroborated by evidence given to Defendants by a teenager named Terrance Bradshaw.

113.    Based on the fabricated evidence, and without Mr. Kamara's alibi witnesses or the benefit of the exculpatory and impeaching evidence, on January 21, 1992, the jury convicted Mr. Kamara of second-degree murder.

114.    He was also convicted of a related gun charge based solely on the fact that the shooter carried a gun and Mr. Kamara did not have a license to carry a gun. In reality, Mr. Kamara was not the shooter and never did carry a gun, so that conviction was also wrongful and caused by Defendants' fabrication, suggestive identification procedures, and unlawful suppression.

115.    The second-degree murder conviction likely reflects jurors' doubts about Mr. Kamara's guilt, as the facts of the crime would no doubt justify a first-degree murder conviction.

116.    On January 22, 1992, Mr. Kamara was sentenced to 3–5 years' incarceration on the gun count and life on the second-degree murder count.

**Mr. Kamara is released on parole. Nearly fourteen years later,
a post-conviction investigation ends in the vacatur of his
convictions and *nolle prosequi* of the criminal charges.**

117.    At his initial parole hearing, although he knew it hurt his chances at parole, Mr. Kamara truthfully and steadfastly maintained that he had absolutely nothing to do with Taylor's murder.

118.    The parole board unanimously granted his application. He was released to the community on parole on May 6, 2009. By that time, he had spent almost eighteen years wrongfully incarcerated.

119.    For the next nearly fourteen years, Mr. Kamara was forced to navigate life wrongfully branded as a murderer, and forced to comply with restrictive parole conditions.

120.    In August 2021, Mr. Kamara asked the Integrity Review Bureau of the Suffolk County District Attorney's Office to review his convictions. In response, he was sent exculpatory and impeachment evidence that had never been previously disclosed to him.

121.    The Suffolk County District Attorney's Office also began a re-investigation of the Taylor murder.

    a.    That reinvestigation included an interview with James Jones, who reaffirmed that Defendant Doyle had explicitly acknowledged that Defendants knew Mr. Kamara was innocent but were happy to prosecute him anyway. Jones also explained that everyone in the neighborhood knew that John Doe had killed Taylor. Jones further explained that John Doe had confessed to him.

    b.    That reinvestigation included an interview with McClinton, who did not want to incriminate himself and admit he committed perjury, but who did admit that he

had never seen the shooter before the day Taylor was killed (McClinton clearly forgot that he had testified to the contrary). And McClinton demonstrated consciousness of guilt: he incorrectly believed Mr. Kamara was still wrongfully incarcerated at the time, and repeatedly pleaded with the investigators to do something to set Mr. Kamara free.

122.    On October 8, 2021, Mr. Kamara filed a motion for a new trial in Suffolk Superior Court, asserting he was entitled to a new trial on grounds which tend to establish innocence, including numerous prejudicial constitutional violations committed by law enforcement in his case.

123.    Asking for a new trial carried significant risk: a new trial could result in another conviction, and the sentencing judge might send Mr. Kamara back to prison. But Mr. Kamara was completely innocent and deserved to have his name cleared.

124.    On November 3, 2022, after an extensive review of the trial record and re-investigation of the evidence, the Office of the District Attorney for Suffolk County filed a response assenting to Mr. Kamara's requested relief, admitting that "significant *Brady* material" had been withheld from Mr. Kamara "and that Kamara was prejudiced by the non-disclosure." The Commonwealth also noted that "the non-disclosure of these materials is especially troubling because of the very weak identification evidence used to convict the defendant[.]"

125.    On March 21, 2023, Superior Court Justice James F. Lang held a hearing on Mr. Kamara's motion for a new trial.

126.    On March 22, 2023, Justice Lang wrote that the court "readily concludes" that the case against Mr. Kamara was "weak," so the *Brady* violations were material. Justice Lang vacated Mr. Kamara's convictions.

127.    Also on March 22, 2023, the prosecution entered a *nolle prosequi*, ending the prosecution.

**Mr. Kamara's wrongful conviction was caused by the City's
unconstitutional customs and deliberate indifference.**

128.    The unconstitutional conduct of the Defendants described above was directly and proximately caused by the City's deliberate indifference to the constitutional rights of Boston residents. That deliberate indifference manifested in the unconstitutional policies, patterns, practices, and customs in the BPD, and in the BPD's failure to adequately train, supervise, and discipline its officers notwithstanding actual and constructive knowledge that the inadequacies had caused constitutional violations and were likely to continue to do so, and notwithstanding the fact that constitutional violations were a highly predictable result of the inadequacies (that is, the need for more and different training, supervision, and discipline was obvious).

129.    During (and around) the 1990s, the BPD had a pattern, practice, and custom of fabricating evidence, including but not limited to by coercing false statements from witnesses to crimes (or even people who *didn't* witness crimes but could be coerced into saying they did). Individual "witnesses" who had little or no information about a crime were subjected to repeated police intervention, and the witnesses were incentivized and intimidated into making identifications of individuals whom the police chose as their suspects. Time and again, innocent men were convicted of serious offenses, including rape and murder, and imprisoned for decades based on unreliable and fabricated identification evidence.

130.    During (and around) the 1990s, the BPD had a pattern, practice, and custom of suppressing exculpatory and impeachment evidence, particularly evidence that implicated suspects other than the BPD's chosen target. In particular, the BPD had a custom and practice of

withholding exculpatory and impeachment evidence that was maintained in detectives' separate

files, whether paper "desk files" or files kept electronically.

131.    During (and around) the 1990s, the BPD had a pattern, practice, and custom of

framing young Black men for serious crimes they didn't commit, including rape and murder,

especially when the BPD suspected those young Black men of selling illegal drugs or being

involved in gangs, and especially when the BPD perceived those young Black men being

insufficiently deferential and submissive to the police.

132.    During (and around) the 1990s, the BPD had a custom of failing to properly

investigate complaints of misconduct and to discipline officers who engaged in misconduct.

133.    During (and around) the 1990s, the Internal Affairs Division of the BPD had a

custom and official policy of delaying investigations of officer misconduct. This delay allowed

misconduct to go unpunished since the civilian complainants often could not be found or had lost

interest in the complaint by the time the investigation genuinely got underway. When the custom

and policy was discovered, BPD leadership and the mayor justified it by incorrectly saying that

investigations *had to* be delayed in order to protect the officers' Fifth Amendment rights against

self-incrimination. That is, if the officers' conduct was so bad that it was potentially criminal, the

BPD's custom and official policy was *not* to investigate until so much time had elapsed that it

was clear there would be no criminal prosecution.

134.    Even when investigations revealed officer misconduct, including but not limited

to the individual Defendants here, the BPD and the supervisors who had knowledge took no

steps to increase supervision of those officers, create added safeguards, or discipline them

(including by removing them from their positions). This enabled those officers to reoffend, and

other officers to know that they too could engage in misconduct without meaningful consequence.

135.    As just one example, serial civil-rights violator Peter O'Malley and another officer, Arthur Linksy, were in plainclothes when they got into a fight with a police informant. A uniformed patrolman, Joseph Fiandaca, intervened and punched O'Malley and Linksy (not realizing they were police officers), causing Linsky to hit his head on the pavement. O'Malley, who was the most senior, directed the other officers to cover the whole incident up, and O'Malley filed a false police report about the whole thing, fabricating a story that he and Linksy were attacked by a group of youths. Despite that complete fabrication, and O'Malley's subsequent lies to Internal Affairs, the BPD gave him only a slap on the wrist for "failing to file a report," as if this were a mere administrative oversight. When that incident came to light, it received substantial news coverage, including an article in the Boston Globe entitled *2 disciplined for covering up details of detective's beating*.

136.    In 1988, BPD officers beat a man named John J. Smith while civilians watched. The BPD's internal investigation unit claimed it was unable to identify the officers. That was false—the officers were easily identifiable: the Massachusetts Attorney General's Office identified them and obtained an injunction against them under the state civil-rights statute.

137.    The purposeful inadequacy of the BPD's Internal Affairs Division was so well established and well known that in 1980 the Boston Globe ran an article with the headline, "Boston Police tilt investigations against complaints of brutality." The article described an example incident in which a federal jury found that BPD officers had used excessive force and beaten a man during a traffic incident, but the BPD's Internal Affairs Division "concluded, as it usually does, that the complaint could not be substantiated." The Internal Affairs Division's

report reached that conclusion by completely omitting evidence provided by a married couple who were eyewitnesses to the incident (one of whom testified in court in the citizen's successful civil-rights suit). The Boston Globe's own investigation "found a lack of thoroughness by officers investigating the cases and serious deficiencies in the system, which favors the police officer during every step of the investigative and disciplinary procedures." Although the Globe was only given a small sample of Internal Affairs files to review, it still found a second case in which the Internal Affairs Division ignored evidence provided by eyewitnesses, then reached a pro-officer outcome, but the citizen prevailed in his civil-rights lawsuit. The article prominently quoted the BPD Commissioner admitting that the BPD "has problems investigating allegations of misconduct by one of its employees," and saying the Internal Affairs investigators were "reluctant to proceed" and would "rather think of 10 reasons why they don't have to go [investigate] rather than the one reason why they had to." A former BPD Commissioner was harsher in his criticism of Internal Affairs: "They're not called 'whitewash alley' for nothing. That's what we called it."

138.    A later article in the Boston Globe reported on even more such cases, after the Globe was able to review additional Internal Affairs files: "The Boston Police Department appears to have ignored key evidence when investigating the actions of officers accused of wrongdoing in at least seven cases in which the officers were ruled to have acted properly…. In six of the seven cases, lawsuits filed by victims or survivors were settled in the victim's favor for a total of $985,500 paid by the city. A suit filed in the seventh case is pending." That article reported that "[t]ranscripts of tape-recorded interrogations of police officers by Internal Affairs investigators also show the investigators helping the police officers answer their questions." The BPD refused to turn over the full set of Internal Affairs files, and used its own recalcitrance as a

defense, trying to undermine the Globe's investigation by stating it was based on "incomplete data."

139.    Additional specific incidents of Internal Affairs whitewashing, all publicized by the early 1990s, include the cases involving: Officer James E. Hall's shooting of Jose Hernandez; Officer James E. Hall's beating and choking of Eugene Sanders; Detective Clayton Pressley's shooting of Rolando Carr; Officer Joseph Quinn's beating of Edward Goodwin and Helen Brogna and framing them for assault; Officer Joseph Quinn's killing of Vincent Mancuso; Officer Richard Sweeney's beating of Mario Gerard and framing him for assault; and Sergeant Neil Powers's shooting of Brian Langton.

140.    The Globe also reported on the BPD's handling of citizen complaints against officers who were repeat offenders, like Robert Summers. Summers had been the subject of *twenty* complaints of physical and verbal abuse, all before he allegedly pushed a handcuffed man down a set of stairs and then denied the man medical treatment for his injuries, resulting in massive internal bleeding and permanent injuries. Reporting in the early 1990s described how the City was at fault because for years it had worked to keep Summers's track record a secret, instead of properly supervising and disciplining him.

141.    As the Globe reported in August 1991, "Internal Affairs has repeatedly failed to substantiate allegations of misconduct against officers who have long histories of citizen complaints." In the early 1990s, the Globe reported that there was heightened attention on the BPD's Internal Affairs Division after "a Dorchester youth was fatally shot by a police officer who had been the subject of several previous Internal Affairs investigations, but never disciplined." That officer was James E. Hall, the same officer who shot Jose Hernandez and who beat and choked Eugene Sanders. Hall was convicted of manslaughter. As the Globe reported,

"The danger of allowing police misconduct to fester is tragically shown by the conviction of Officer James Hall for manslaughter. Here was a man, easily provoked to violence, who should never have been allowed on the force. But once he was sworn in, the ineffectiveness of Internal Affairs allowed him to remain a police officer for five years."

142.    Even as the Globe in the early 1990s reported on instance after instance of egregious police misconduct, and the BPD's unconstitutional practices and failures became widely known, the mayor stood firmly behind the BPD chief; as the Globe reported, the two were "boyhood friend[s] from South Boston."

143.    And in the extremely rare instance in which Internal Affairs substantiated a complaint and pursued discipline, BPD higher-ups would intervene to thwart the case. The Boston Globe reported on one such incident, in which William R. Celester, a deputy superintendent, was found to have sexually harassed a woman by promising her a promotion from crossing guard to police officer, getting her to come to a private home, and forcing her to have sex with him. In the disciplinary hearing, after the close of evidence, the BPD's legal advisor had an *ex parte* communication with the hearing officer and falsely claimed that a key witness had recanted. On the basis of that supposed recantation, the hearing officer recommended that Celester be exonerated. But the recantation never happened; it was made up by the BPD's legal advisor.

144.    During (and around) the 1990s, the BPD had a custom of a "code of silence" or a "blue wall" in which BPD officers understood that they were not to report misconduct by fellow police officers.

145.    The public scandals involving Commissioner Dennis White and officer (and union president) Patrick Rose demonstrate the power of the code of silence. Both men were

investigated for serious misconduct (domestic abuse and sexual abuse of children, respectively) in the 1990s, but fellow BPD officers protected them.

146.    Around the time Mr. Kamara was framed, the "blue wall" or code of silence prevented BPD officers from truthfully reporting misconduct. For instance, in 1995, the beating of Michael Cox, a Black undercover police officer, took place—by other BPD officers who at first did not realize he was a fellow officer. When they realized their mistake, the officers closed ranks. They told Cox's wife that Cox had slipped on a patch of ice. They wrote police reports that obscured what actually happened. Despite many internal investigations, none of the offending officers was identified, and no one came forward to take responsibility or to report the misconduct of their fellow officers. Cox had to file a civil suit to get any measure of justice. He became a target: BPD officers cast him out, slashed his tires repeatedly, and made him a pariah. The City settled for nearly $1 million.

147.    On May 14, 2021, Boston mayor Kim Janey admitted that "a blue wall of silence was confirmed" in relation to an investigation into allegations against former Commissioner White stemming from the early 1990s. The mayor said, "officers were intimidated into silence for fear of retaliation."

148.    Even though the BPD's widespread serious violations of rights and laws was well known, including to policymakers and supervisors, the City was deliberately indifferent and allowed it to persist. One article in the Boston Globe in 1980 described how an officially-sanctioned report found "corruption and tolerance of criminal activity by officers" in one specific unit, but explained the BPD Commissioner refused to implement the recommendations of the group tasked with reforming that unit, because the Commissioner was "unwilling to incur the wrath of the rank and file."

149.    At the time relevant to this case, there was a pattern, practice, custom, and policy whereby the City systematically failed to train, supervise, and discipline its officers, leading to a culture of impunity that encouraged and permitted the type of officer misconduct described above.

150.    As a former legal counsel to the BPD explained to the Boston Globe in 1989, promotions and appointments to the rank of detective were made "for political reasons rather than merit, leaving unqualified and improperly trained detectives to handle cases." He explained that it was a problem that detectives were appointed "discretionarily by the commissioner" with "no criteria, [and] no exams."

151.    BPD supervisors and policymakers for the City had actual and constructive knowledge of the BPD's customs—including customs of fabricating evidence, suppressing evidence, performing improperly suggestive identification procedures, performing perfunctory sham internal investigations, and maintaining a blue wall or code of silence—and actual and constructive knowledge that these customs caused individuals to be implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved. But BPD supervisors and policymakers for the City were deliberately indifferent to the constitutional rights of Boston residents and so did not adequately address the problems.

152.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue in this case, by failing to adequately train, supervise, and discipline the BPD's officers, agents, and employees who withheld material evidence, fabricated false evidence, and pursued wrongful prosecutions and convictions. These

widespread practices were allowed to exist because municipal policymakers exhibited deliberate indifference to the misconduct, thereby effectively ratifying it.

153.    The unconstitutional policies, practices, patterns, and customs in effect—including specifically fabricating evidence, suppressing evidence, engaging in improperly suggestive identification procedures, and failing to conduct constitutionally adequate investigations—caused *numerous* wrongful convictions right around the time of Mr. Kamara's wrongful prosecution and conviction.

154.    In 1984, BPD officers framed Joseph Jabir Pope and a co-defendant for murder, leading to a wrongful conviction and 38-year wrongful incarceration. BPD officers fabricated the only evidence against Mr. Pope—an inculpatory statement from the victim's brother. They did so by threatening the brother with charges for his own criminal wrongdoing if he didn't comply, but promising leniency if he did, and by coaching him as he continually changed his story until it matched their preferred theory. BPD officers then suppressed earlier, inconsistent versions of the brother's story (along with other exculpatory and impeachment evidence, including the presence of cocaine at the crime scene, which suggested the killing was drug-motivated). To convict their chosen target, the BPD also purposefully ignored credible leads pointing at another suspect (a man who was found in possession of the murder weapon). The City settled Mr. Pope's civil-rights suit for an undisclosed amount.

155.    In that same case, BPD officers framed Mr. Pope's co-defendant, Albert Brown (a.k.a. Floyd Hamilton). In addition to the misconduct described in the preceding paragraph, BPD officers fabricated an eyewitness identification by using an unduly suggestive identification procedure—showing the witness a single photo of Mr. Brown alone, rather than using a fair photo array or live lineup. And BPD officers violated Mr. Brown's Fifth Amendment rights by

coercively questioning him in a custodial setting despite his explicit request that questioning stop.

156.    Between 1986 and 1988, BPD officers framed Carlos Montilla for cocaine trafficking and illegal possession of a firearm. The case against Montilla was fabricated from top to bottom by a BPD officer who had a personal vendetta against him. That officer lied to the prosecutor about having witnessed Mr. Montilla selling drugs, and planted Mr. Montilla's driver's license at a crime scene that Mr. Montilla had never in his life been to. The BPD withheld substantial exculpatory and impeachment evidence (including multiple details about the crime scene that would have proved the BPD officer's story was impossible, and including details about the personal vendetta). During the post-conviction proceedings that resulted in Mr. Montilla's conviction being overturned, the BPD officer refused to testify, asserting his right against self-incrimination. He was soon thereafter convicted of a *different* crime and sentenced to three years in prison. When Mr. Montilla filed his civil-rights suit against the City, he detailed how the BPD officer who framed him had been the subject of numerous internal investigations for a decade, and had in fact been found to have lied, but nonetheless was allowed to be on the force and in a position to frame civilians like Mr. Montilla. He alleged that the City allowed officers to escape serious investigations by offering vague and conclusory explanations for their misconduct. The City settled that civil-rights suit for an undisclosed amount.

157.    In 1989, BPD officers framed Shawn Drumgold for the murder of a twelve-year-old girl. BPD officers fabricated incriminating evidence against Mr. Drumgold. Two witnesses later recanted, explaining they were intimidated by BPD officers into providing false testimony against Drumgold. One witness testified that two BPD officers had "fed him details of the crime" he otherwise would not have known to get him to falsely implicate Mr. Drumgold. The

information included, for example, descriptions and photographs of Mr. Drumgold, descriptions of Mr. Drumgold's clothing and car, and details of incriminating conversations Mr. Drumgold was falsely alleged to have had with a co-defendant. The witness said that he told the BPD officers who the real perpetrator was—because "everyone in the neighborhood" knew who it was—but the officers insisted on pursuing Mr. Drumgold anyway. BPD officers also withheld exculpatory evidence, including information about a viable suspect who was identified after Mr. Drumgold had already been arrested, and including substantial benefits given to a witness in exchange for his false evidence (including months of free housing and meals, plus spending money). The City settled the civil-rights suit against it for $5 million.

158.    In 1988, BPD officers framed Marvin Mitchell for the abduction and rape of an 11-year-old girl. The girl had told the officers that her assailant was wearing pink pants. To frame Mr. Mitchell, two BPD officers fabricated evidence, falsely claiming that Mr. Mitchell had admitted to wearing pink pants on the day in question—something that is untrue and was completely invented by the BPD officers for the purpose of convicting Mr. Mitchell. They did so despite knowing for certain he was innocent (the victim said her assailant was clean-shaven, but just one day after the assault BPD officers saw that Mr. Mitchell had a mustache and goatee). BPD officers also used an improperly suggestive identification procedure to secure false evidence against Mr. Mitchell. The City settled the civil-rights suit against it.

159.    In 1989, BPD officers framed Christopher Harding for shooting a man named Deron Jones and then shooting at the BPD officers who responded to the scene. In reality, two men shot at Mr. Jones, and one of them surrendered at the scene. The other fled and BPD officers chased him, but lost him. They came upon Mr. Harding who was sleeping, woke him up, and decided to frame him as the second shooter. At least three BPD officers fabricated evidence

against the completely innocent Mr. Harding, including their own first-hand false stories as well as coercing a civilian witness to provide false evidence. When one of the officers got cold feet and became a risk to the fabricated case, BPD supervisors told her to ignore a defense subpoena and lied to the judge, saying she was out of town and unavailable for trial. BPD officers also suppressed exculpatory evidence, including by withholding the real shooter's hat and jacket, which were left at the scene, so Mr. Harding could not prove they were not his. The City settled the civil-rights suit against it.

160.    In 1990–92, BPD officers framed Neil Miller for breaking and entering, robbery, and rape. BPD officers used improperly suggestive identification procedures to fabricate identifications of Mr. Miller; coerced a witness into identifying Mr. Miller by falsely telling her that Mr. Miller was a bad person who had raped a 90-year-old victim; fabricated evidence to undermine exculpatory evidence; withheld exculpatory serological evidence; manufactured falsely inculpatory serological evidence; and failed to investigate an obvious lead that would have exculpated Mr. Miller. The City settled the civil-rights suit against it for $3.2 million.

161.    In 1991, BPD officers framed Anthony Powell for rape, kidnapping, and armed robbery. BPD officers used improperly suggestive identification procedures that caused the victim to falsely identify Mr. Powell; fabricated forensic evidence to distort and undermine scientific evidence showing that Mr. Powell was innocent; suppressed exculpatory forensic evidence; and supervisors failed to properly supervise officers under their command. BPD officers improperly told the victim that her attacker was in the photo array they presented her, and included people in that array that were known to her (and known *not* to be her attacker), thereby reducing the size of the array. After she tentatively picked Mr. Powell's photo, a BPD detective told her that she had "picked the right one," and told her Mr. Powell's name—both

completely improper tactics to falsely bolster her confidence in her (incorrect) identification. After his DNA exoneration, Mr. Powell sued the City, and the City settled the suit for $3.8 million.

162.    BPD detectives framed Robert Foxworth for a 1991 murder. Among other things, detectives in that case—including Defendant Flynn—coerced testimony from a 15-year-old eyewitness by threatening to take that witness into custody. Detectives fabricated that witness's identification by subjecting him to an identification procedure in which *only* Mr. Foxworth—BPD's chosen target—had a ponytail, even though detectives knew that the real perpetrator had a ponytail and confirmed with the witness that the witness had observed the ponytail. The witness made clear that he was only identifying the hairstyle of the perpetrator, but BPD detectives fabricated that the youth had identified Mr. Foxworth specifically. Detectives suppressed evidence that the father-in-law of one of the true perpetrators had identified his son-in-law as being involved in the crime. BPD officers also suppressed powerful exculpatory evidence later sent to them by federal prosecutors, detailing the real reason for the killing (an ongoing struggle for power among cocaine dealers) and identifying the real killer. When Foxworth's conviction was finally overturned nearly three decades later, prosecutors explicitly acknowledged "the substantial likelihood that the unnecessarily suggestive identification procedure could have resulted in a misidentification of the defendant."

163.    In 1992 and 1993, BPD officers, including Defendant Harris, framed Ronnie Qualls for a double murder. They did so even though, in a dying declaration, one of the victims told BPD officers who the real killer was; that man was found two hours after the crime, with blood on his sweatshirt that matched the blood type of the victims; and that man's story to the police changed repeatedly over time. All four eyewitnesses to the shooting were familiar with

Mr. Qualls and initially told BPD officers they could *not* identify Mr. Qualls as shooter. But BPD officers unconstitutionally exerted pressure and offered benefits to those witnesses, and successfully coerced three of them into falsely identifying Mr. Qualls. (The lone witness who had no criminal history or pending criminal charges, and so was less susceptible to improper police pressure, is the only one who refused to falsely incriminate Mr. Qualls.)

164.    Daniel Keeler, one of the BPD detectives who framed Mr. Qualls, has a long and sordid history of police misconduct, including framing Shaun Jenkins, Sean Ellis, Donnell Johnson, Marlon Passley, and Rickey "Fuquan" McGee, discussed below. He would go on to later attempt to frame others too, including William Leyden, Kyle Bryant, James Bush, Marquis Nelson, and Joseph Cousin.

165.    Defendant Harris, one of the BPD detectives who framed Mr. Qualls, also framed Shaun Jenkins and Mr. Kamara.

166.    In 1994, BPD officers framed James Lucien for murder. They did so even though, in a dying declaration, the victim told BPD officers that he was shot while in his car, by someone standing outside the car, and Mr. Lucien was *inside* the car with the victim when it happened. John Brazil, one of the BPD officers who framed James Lucien, is a serial civil-rights violator, and has framed other innocent people, including Sean Ellis, discussed below. In Mr. Lucien's case, Brazil stole money from the crime scene (thereby fabricating evidence of theft and hiding physical evidence); tampered with clothing evidence in the victim's hospital room; fabricated evidence that a pager was recovered from the victim's car; and fabricated evidence to exculpate the likely real killer, so that person could provide false evidence against Mr. Lucien. When several BPD officers were later indicted for different misconduct, Brazil testified against them and admitted his own wrongdoing, including preparing false affidavits for search warrants,

falsely claiming to have performed surveillance, and participating in robberies with other BPD officers.

167.    Another officer on Lucien's case, George Foley, had been found mentally unfit and "unable to differentiate fact from fiction" by his supervisors, but was nonetheless permitted to participate in investigations and frame innocent people. BPD supervisors even blessed a false story that covered up Foley's earlier absence—saying he was off work due to an injury, when in reality it was a mental breakdown. Foley would go on to frame other people, including Sean Ellis and Rickey "Fuquan" McGee.

168.    Another detective involved in Lucien's case, William Mahoney, was also involved in framing Donnell Johnson, discussed below.

169.    In the mid-1990s, BPD officers framed Sean Ellis for the murder of an off-duty BPD officer. They did so by, among other things, planting evidence, fabricating evidence, coercing false eyewitness identifications, and suppressing exculpatory and impeachment evidence. For example, a purported eyewitness was brought into the Homicide Unit where detectives presented her with photo arrays. When she failed to identify Ellis on her own, detectives coerced her into a false identification. Detectives later suppressed exculpatory evidence, including police reports, of an alternative perpetrator. When the BPD's misconduct came to light, the City paid $16 million to resolve Mr. Ellis's claims, before he even filed suit.

170.    In 1994 and 1995, BPD officers—including Defendant Doyle—framed Donnell Johnson for murder. They did so by suppressing exculpatory evidence and fabricating a false story that Mr. Johnson refused to cooperate with the police investigation, when in fact he cooperated fully. The officers repeatedly falsely testified under oath that the exculpatory evidence they had suppressed never existed at all, in a deliberate attempt to keep it hidden. When

their lies were exposed and the evidence was discovered, BPD Internal Affairs found mere negligence in failing to turn the evidence over. The BPD officers who framed Mr. Johnson included serial civil-rights violators William Mahoney and Daniel Keeler.

171.    In 1995, BPD officers framed Marlon Passley for a shooting that killed one person and injured two others. Although a man named John Tibbs later confessed and pleaded guilty to the crimes, *four* eyewitnesses identified Mr. Passley as the shooter. On information and belief, *four* eyewitnesses could not have identified the innocent Mr. Passley by mere innocent mistake; instead, BPD officers engaged in improper suggestion, pressure, and/or coercion. Mr. Passley was investigated by, among others, serial civil-rights violator Daniel Keeler.

172.    The BPD's widespread unconstitutional practices continued after Mr. Kamara was wrongfully prosecuted and convicted, as evidenced by the wrongful convictions of at least: Joseph Bennett, Stephan Cowans, Rickey "Fuquan" McGee, Shaun Jenkins, and Daniel Pina.

173.    Additional instances of police misconduct around the time Mr. Kamara was framed provide further support for the existence of the BPD's unconstitutional customs, and provided notice to the BPD that its existing training, supervision, and discipline were woefully inadequate.

174.    BPD officers falsely arrested Gary Willoughby in September 1989, and charged him with homicide. Mr. Willoughby was acquitted of all wrongdoing in 1990, after a BPD officer perjured himself. Mr. Willoughby subsequently successfully sued the City of Boston and the police officer.

175.    In a now-infamous scandal, on October 23, 1989, Charles Stuart shot and killed his pregnant wife, Carol Stuart (the baby was delivered but died within weeks). One BPD detective later testified he immediately suspected Charles of the crime, but his superiors removed

him from leading the case and put notorious civil-rights violator Peter O'Malley in charge, pursuing Charles's false story that a Black man was responsible, targeting a man named William Bennett. Although he was completely innocent, BPD officers used intimidation and coercion to produce witnesses to falsely implicate Bennett. BPD officers threatened witnesses with arrest, physical beatings and imprisonment if they did not provide evidence implicating Bennett. BPD officers offered witnesses money and other inducements to coerce them to falsely implicate Bennett. To make the false evidence appear reliable and true, BPD officers supplied witnesses with crucial facts the witnesses did not know (such as descriptions of Carol Stuart's jewelry and a description of the shooter's clothing that matched Charles's story). And BPD officers planted evidence in homes of witnesses to pressure them into incriminating Bennett.

176.    On November 21, 1991, a Suffolk County grand jury returned indictments against Tarahn Harris for murder in the first degree. In his ruling in favor of Harris's motion to dismiss the indictment, the Honorable Issac Borenstein, Justice of the Superior Court, found that Defendant Spellman "knowingly and intentionally falsified, reckless fabricated, distorted, misled, and deceived the grand jury." Defendant Spellman distorted Harris's statement, suggesting to the jury that Harris made incriminating statements, while failing to inform the jury that Harris actually made exculpatory statements as well. He assigned to Harris statements that Harris had not made and knowledge that Harris may not have had. Judge Borenstein was "convinced that Officer Spellman knowingly falsified and distorted the evidence against Tarahn Harris…for the purpose of strengthening what appeared to be a weak case against Tarahn Harris." In response to a complaint of misconduct relating to this incident made to the Boston Police Department, the Boston Police Department on July 15, 1999, in spite of Judge

Borenstein's findings, found the allegations against Defendant Spellman to be "Not Sustained" and the Police Commissioner accepted the finding.

177.    On information and belief, few, if any, of the officers involved in the above misconduct have been disciplined—and none have been *appropriately* disciplined given the egregiousness of their misconduct and the tremendous harm they caused.

178.    The wrongful convictions listed above (and others not listed) involved many BPD officers as repeat offenders, demonstrating the obvious lack of training, supervision, and discipline.

179.    Boston Police Superintendent Paul Joyce has acknowledged that, around the time BPD officers framed Mr. Kamara, "On the issue of wrongful convictions, there were really systemic issues. The police were part of that."

180.    The wrongfully convicted people discussed above tragically followed in the footsteps of others framed, in prior years and decades, by BPD officers who suppressed exculpatory and impeachment evidence, fabricated incriminating evidence, and used unduly suggestive identification procedures. Those wrongfully convicted people include: Paul Robinson (wrongfully convicted in 1969), James Haley (wrongfully convicted in 1971), Bobby Joe Leaster (wrongfully convicted in 1971), Lawyer Johnson (wrongfully convicted in 1971), Anthony Mazza (wrongfully convicted in 1972), Tyrone Clark (wrongfully convicted in 1972), Ella Mae Ellison (wrongfully convicted in 1974), Laurence Adams (wrongfully convicted in 1974), Milton Jones (wrongfully convicted in 1975), Raymond Gaines (wrongfully convicted in 1976), Frederick Clay (wrongfully convicted in 1981), James Watson (wrongfully convicted in 1981), Ulysses Charles (wrongfully convicted in 1984), and Louis Santos (wrongfully convicted in 1985).

181.    In Milton Jones's case, BPD detectives explicitly said they knew Mr. Jones was innocent but they were willing to get him convicted anyway. The same happened in Mr. Kamara's case. On information and belief, the same happened in other BPD-led wrongful convictions too.

182.    The pressure to close cases and culture of tolerating and even encouraging constitutional violations to reach that end led to the wrongful convictions listed above also drove the detectives in Mr. Kamara's case to fabricate evidence, coerce witnesses, and suppress exculpatory evidence to secure his wrongful conviction.

183.    The pressures exacted by the City and the BPD's priorities were well-known at the time. In the Homicide Unit in particular, the lawless tactics were so well known that the Boston Phoenix published a multi-part series in 2005 about the Unit's problems. The paper documented that the "typical" way that "murder cases are often investigated in Boston" consisted of "detectives leap[ing] to a conclusion based on one bit of circumstantial evidence or one person's often-questionable claim, and then seek—and believe—only evidence and testimony that supports that conclusion."

184.    By the time of Mr. Kamara's arrest, policymakers for the BPD and City were on notice of misconduct by BPD officers including providing false evidence, filing false affidavits in support of search warrants, failing to disclose exculpatory and impeachment material, conducting improperly suggestive identification procedures, and inadequately investigating cases. Although this misconduct deprived people of their constitutional rights, the policymakers did not require officers to comply with the law, nor did policymakers adequately train and supervise officers, nor did policymakers adequately discipline officers for failing to comply with the law.

185.    Police officers and detectives do not come to their jobs with an adequate understanding of their constitutional obligations, including the obligation to disclose exculpatory and impeachment evidence. But they discover such evidence in the ordinary course of their duties: that's a usual and recurring situation. Policymakers know to a moral certainty that officers and detectives will discover exculpatory and impeachment evidence that is unknown to prosecutors, criminal defendants, and defense counsel. The need for training on constitutional obligations, including the obligation to disclose exculpatory and impeachment evidence, was therefore obvious.

186.    BPD detective Daniel Keeler—who is now infamous for having committed multiple constitutional violations in the time frame relevant to this case, including repeatedly failing to disclose exculpatory and impeachment evidence—admitted to the Boston Globe that he and his colleagues had no guidance on how to approach investigations and constitutionally required disclosures, stating that there were no clear protocols or training for homicide investigation. As a result, he believed he had room to engage in misconduct—like fabricating evidence and suppressing exculpatory and impeachment evidence—without repercussion.

187.    In addition to the obviousness of the need for training, supervision, and discipline, the BPD had specific notice of its specific deficiencies, before Mr. Kamara was framed. For example, before Mr. Kamara was framed, the following had occurred: the overturning of Bobby Joe Leaster's wrongful conviction; the overturning of Lawyer Johnson's wrongful conviction; the overturning of Ella Mae Ellison's wrongful conviction; the overturning of Carlos Montilla's wrongful conviction (and the criminal conviction of one of the officers who framed Mr. Montilla); the acquittal of Gary Willoughby after a BPD officer's perjury; the finding of civil liability against BPD officers who killed a man named James Bowden and fabricated evidence to

falsely justify their actions; and the submission of an affidavit by a witness against Raymond

Gaines, swearing he lied because, despite his own criminal activity, BPD detective Peter

O'Malley promised to keep him out of jail if he falsely incriminated Mr. Gaines.

188.    Also before Mr. Kamara was framed, the City was embarrassed by the debacle of

the Willie Sanders case. As widely reported, including in the New York Times and Boston

Globe, BPD officers accused Mr. Sanders of a series of rapes, and prosecuted him for four of

them, but he was acquitted of two, prosecutors dropped another, and the last one was dismissed

after—as recounted in 1990 article in the Boston Globe—a judge found "that investigators had

bungled the evidence and used suggestive techniques to coax victims to identify Sanders." As

reported, BPD officers arrested Mr. Sanders before any victim had identified him; had lied and

said that all victims had identified him, even though at least one had said he was *not* her attacker;

had used an improperly suggestive identification procedure; and had destroyed evidence that

could have exonerated him, including a partial fingerprint. Moreover, three of the rapes had

occurred while Mr. Sanders was under police surveillance, and two similar rapes occurred after

he was arrested, but that didn't stop the BPD from pursuing his wrongful prosecution.

189.    Also before Mr. Kamara was framed, the City was embarrassed by the debacle of

the Albert Lewin case.

    a.  As widely reported beginning in early 1989, BPD officers accused Mr. Lewin of

        murdering a BPD detective. BPD officers claimed that their investigation had

        been aided in the beginning by a confidential informant (whose information was

        somewhat exculpatory for Mr. Lewin), but when the defense asked to interview

        the supposed informant, BPD officers balked. Several officers lied and said they

could not locate the informant, and even filed false reports with the court to that effect.

b.  The prosecutor claimed the officers were perjuring themselves and *could* locate the informant (and the trial judge dismissed the indictment, finding the officers' suppression was intentional and egregious).

c.  In an attempt to save the prosecution, the BPD officers then claimed they had fabricated the existence of the informant entirely, to unconstitutionally secure a search warrant. That did save the prosecution, as the state's highest court accepted that explanation and reinstated the indictment (since there was no informant, there was no exculpatory information he could possess that was being suppressed).

d.  It was learned that the BPD Commissioner had been informed that the search warrant affidavit was fabricated but decided to "sit on" that information because he could expect the problem would just "go away."

e.  One of the officers told the Boston Globe that, by fabricating the existence of an informant, he was just doing what he had been taught by more experienced officers and what he believed was "accepted practice." He said that when he tried to cover up his misconduct, he "was acting at the behest of his superiors."

f.  The officers' colleagues came to their defense, telling the Boston Globe that the officers' conduct was "not uncommon in an era when police are under pressure to crack down on drug dealing." One colleague said that the officers' misconduct "saves [police] a lot of work. Technically, it's wrong, and you can say it violates the Constitution. But I don't think the framers of the Constitution could ever have imagined trying to fight a drug war." Another officer offered this "justification"

for fabricating the existence of an informant: "You've got to understand that in this business, the thing is volume. You have to arrest a guy six or seven times before a judge is going to put him away. It's physically impossible to do the work required to get a warrant every day. So sometimes you have a nonexistent informant saying something that's obvious. I'm not saying that's right. I'm saying that's the real world." Another BPD official told the Boston Globe, "It would be hard to find a police officer who's done a lot of warrants that hasn't done that…. Everyone huffs and puffs and says how terrible it is, but everyone also knows it's done all the time."

g.  During the widely publicized trial, BPD officers tried to introduce new fabricated evidence against Mr. Lewin, claiming they had seized evidence from the crime scene but kept it in their personal possession for years, rather than submitting it for testing, and now that they had finally tested it they found Mr. Lewin's fingerprints. The jury rejected these fabrications and, in October 1990, acquitted Mr. Lewin after deliberating only a few hours.

h.  Incredibly, after the acquittal and with the public discussion of the widespread and embarrassing police misconduct, the mayor's response to the Boston Globe was that "the last thing police officers in this city need is criticism and discussion of what they should have done differently."

190.  Also before Mr. Kamara was framed, a judge threw out a jury's 1989 guilty verdicts on drug charges secured through the testimony of Boston police officer Trent Holland. When Superior Court Judge Elizabeth A. Porada threw out the verdicts, she ordered an investigation into whether or not Holland committed perjury (which he clearly had). Judge

Porada concluded that Holland's testimony about watching a drug transaction from a certain

vantage point was necessarily false because his view would have been obstructed by a building.

When Holland's lie was discovered, he claimed that the building had not been there two years

earlier when the crime allegedly occurred—but that, too, was a lie (the building's owner came to

court and testified). The perjury "investigation" was conducted by Boston police Sergeant James

Curran. Not only was Holland not disciplined, he was promoted to detective.

191.    Also before Mr. Kamara was framed, newspapers widely reported how BPD

officers procured evidence against Shawn Drumgold and his co-defendant by willfully

disregarding their constitutional rights. Officers interrogated the men in a custodial setting

without letting them speak to their lawyers, despite not only the clear constitutional rule against

doing so, but a judge's specific orders that they refrain from doing so. When that misconduct

came to light, the mayor brushed off the officers' misconduct as a mere "technicality."

192.    Also before Mr. Kamara was framed, in 1989, a BPD officer falsely testified to a

grand jury that he saw a gun hidden on a second-floor landing. The judge—in *Commonwealth v.*

*Phillips*—found that the officer would have had to be "30 feet fall" for his testimony to be true.

Only then did the officer admit that his testimony was false. Though the charges against the

defendant were dismissed, the officer was not disciplined.

193.    The framing of Mr. Kamara took place after the Massachusetts Attorney general

released a comprehensive report detailing BPD misconduct during the now-infamous

investigation into the murder of Carol Stuart. The Attorney General explained publicly that his

team had "found a broad pattern of infringement of individual civil rights." And the framing of

Mr. Kamara took place contemporaneous with a similar report released by federal investigators.

These reports concluded that BPD detectives "pressured witnesses to give false information,

threatened witnesses, and included false coerced information in search warrant affidavits." Other BPD misconduct documented by the federal investigators included "apparent attempts to plant controlled substances in the home of witnesses."

194.    When these reports were released, federal law-enforcement sources told the Boston Globe that "a major stumbling block in the investigation" was the code of silence or blue wall of silence, that is, the "closing of ranks by police officers, who would not testify against their colleagues." And BPD leadership incredibly relied on its own officers' refusal to cooperate, denouncing the federal report as "one-sided." Moreover, despite egregious BPD misconduct laid out in the official reports, both the mayor and BPD Commissioner publicly stood firmly behind BPD officers.

195.    The BPD instead conducted its own whitewash investigation into the Stuart scandal, spinning that officers' threats to witnesses were mere attempts at humor, and their incidents of including false information in warrant applications were mere paperwork snafus. As the Boston Globe reported, the former Massachusetts Attorney General, the U.S. Attorney, an Associate U.S. Attorney General, and several law-enforcement specialists criticized the BPD's internal report as a shoddy whitewash. Indeed, although BPD leadership had previously committed to creating a Community Appeal Board—a panel with non-police community members—to review its investigations, the Commissioner purposefully delayed its implementation until after the Stuart investigation was closed, so there could be no citizen review.

196.    When the Boston Globe asked for the underlying records, to see if the BPD's investigation was a whitewash, the BPD refused to turn them over. Only after the state's highest court unanimously ruled in favor of the Globe were the records disclosed, and they revealed that

"[t]he credibility of police witnesses was never questioned; their denials were never explored. And some of the information in the [BPD] report is simply inaccurate." Notably, "[t]he issue at the crux of the controversy—how witnesses were able to supply information known only to police and the killer—was barely addressed."

197.    The BPD's obvious failure to train continued for years. After a five-part series in the Boston Globe questioned the quality of the BPD's work, the mayor appointed attorney James St. Clair to head a panel to examine management practices at the department. In 1992, the St. Clair committee issued a scathing report concerning the state of the BPD's grossly inadequate training, supervision, and discipline, showing the BPD's deliberate indifference to the constitutional rights of Boston's residents. That report carefully documented how "[m]anagerial training was 'dangerously inadequate' and detective training was virtually nonexistent." The report also documented how the BPD, including through its Internal Affairs Division, was creating an "unnecessarily dangerous situation for the citizens of the City of Boston" by inadequately supervising and disciplining officers who had demonstrated "established patterns of alleged misconduct." The BPD's failures were obvious and widespread, not hard-to-notice, so St. Clair explicitly blamed top policymakers, including the BPD Commissioner. The St. Clair commission, Boston newspapers, and Boston television news programs, called for the appointment of a new Commissioner, but the mayor refused to fire his lifelong friend and instead reappointed him for another five-year term.

198.    The St. Clair Report also revealed a wide range of problems in BPD's Internal Affairs Division, including but not limited to disorganized and incomplete files, lack of documentation, and "an inappropriately restricted" investigation process attributable to "a misinterpretation of the applicable law…[which] often resulted in unnecessarily lengthy delays

and a failure to investigate and impose sanctions against officers involved in the most serious misconduct." It also found that there was "no incentive for a good investigation and no sanctions if the investigation is done poorly." It found that in a whopping 79% of cases, the Internal Affairs investigators neglected to contact *any* civilian witnesses. "No police department and no community should tolerate a situation where officers with a long record of alleged misconduct, including some with histories of alleged physical abuse of citizens, remain on the street largely unidentified and unsupervised," the report said.

199.    The report concluded that the BPD had a "near total lack of accountability" for its officers. "As a result, there are not department-wide systems to gauge the performance of police officers or hold supervisors, patrol officers or detectives accountable for their actions or performance," the report said. The report found that the BPD had *no* formal system in place to identify officers with repeated complaints filed against them, nor any ability to identify troublesome patterns of behavior. The records pertaining to a single officer's history were not even kept in one place, they were scattered in multiple different locations. As a result, the commission found that one BPD officer remained on the job despite being the subject of 30 complaints; and another remained on the job despite 28 complaints.

200.    Again, the St. Clair commission squarely blamed the BPD Commissioner, concluding "he had not demonstrated a willingness or a capacity or an appropriate method of dealing with disciplinary matters within the Police Department." Or, as the Boston Globe reported, the BPD Commissioner "created a system in which Boston residents were encouraged to take the time and trouble to file a complaint against an officer, then watch as the case vanished somewhere in the mysterious police bureaucracy."

201.    As one example of the BPD's stubborn refusal to discipline its employees for even egregious misconduct, the St. Clair report noted that federal investigators gave the BPD evidence of egregious police misconduct related to the Carol Stuart investigation—including evidence of coercing false statements from witnesses, using those false statements to obtain search warrants, and planting evidence to use as leverage against witnesses. But more than two years after that misconduct, and more than six months after the federal report was released publicly, BPD *still* had not issued any discipline or even held any hearings on the matter. "This delay and inaction is inexcusable," the committee concluded.

202.    The St. Clair report acknowledged the blue wall or code of silence: "It has come to our attention that there may be efforts to punish those police officers who spoke to the committee."

203.    The St. Clair report details that in the ten-year period between 1981 and 1991, complaints of alleged misconduct filed against BPD personnel increased dramatically, from 171 in 1981 to 472 in 1990. That's consistent with the fact that, in that time period, the City and the BPD publicly adopted a "zero tolerance policy" for crime and pressured officers to rapidly increase clearance rates at any cost. In turn, the BPD fostered a culture of prioritizing swift investigations over accurate, fair, and lawful ones. This culture tolerated and even encouraged egregious constitutional violations; namely, fabricating and coercing evidence as well as suppressing exculpatory evidence.

204.    It was not until 1992 that the BPD adopted "Rule 320," which directs that "[a] police officer shall immediately notify the prosecutor of a case in which he is involved of all material facts which could affect the prosecution of the case as soon as such facts become known to him."

205.    It was not until 1995 that the BPD adopted "Rule 113" which includes the Canon of Ethics, including the Canon that officers "shall not falsify evidence."

206.    Mr. Kamara's wrongful convictions, incarceration, and parole directly resulted from widespread and accepted BPD customs of fabricating evidence, conducting improperly suggestive identification procedures, coaching witnesses to testify falsely, failing to properly and honestly investigate legitimate leads and suspects, failing to properly train, supervise, and discipline its police officers, covering up known misdeeds, and withholding exculpatory and impeachment evidence, all with the aim of obtaining a conviction regardless of the truth and in violation of rights secured by the United States Constitution and Massachusetts Declaration of Rights, as well as other state laws.

207.    The BPD customs and failures to train, supervise, and discipline described above were the moving force behind the actions of the individual Defendants. The individual Defendants were following those customs when they framed Mr. Kamara. And the individual Defendants knew—from the BPD's deliberately indifferent failure to train, supervise, and discipline—that they could engage in misconduct with impunity because they would not face meaningful discipline or intervention by the BPD.

**Defendants' unconstitutional misconduct caused Mr. Kamara tremendous harm.**

208.    Mr. Kamara brings this action to address the extraordinary and unconstitutional misconduct of Defendants, which caused Mr. Kamara's wrongful arrest, prosecution, conviction, nearly eighteen years of wrongful incarceration, and nearly fourteen years of wrongful parole.

209.    Mr. Kamara was only 17 when arrested, and his name was not cleared until he was 49.

210.    As a direct and proximate result of Defendants' actions and omissions, Mr. Kamara sustained injuries and damages, some of which will continue into the future, including

but not limited to loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; loss of income; loss of educational and work opportunities; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

211.    As a direct and proximate result of Defendants' actions and omissions, Mr. Kamara sustained physical injuries and damages, including: physical pain and suffering, personal injuries, and infliction of physical illness and inadequate medical care.

212.    All of the acts and omissions committed by Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith.

## **CLAIMS**

**Count I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Deliberately Suppressing Material Exculpatory and Impeachment Evidence, and Conducting Impermissibly Suggestive Identification Procedures**

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

213.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

214.    The individual Defendants, acting individually and in concert, deprived Mr. Kamara of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial.

215. The individual Defendants deprived Mr. Kamara of his right to a fair trial by fabricating inculpatory evidence, fabricating evidence to undermine an alibi, and using improper suggestion, pressure, and coercion to obtain false statements from witnesses.

216. The individual Defendants deprived Mr. Kamara of his right to a fair trial by deliberately withholding exculpatory and impeachment evidence from prosecutors and defense.

217. The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Kamara's clearly established constitutional rights.

218. No reasonable officer in 1991 would have believed this conduct was lawful.

219. As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent almost fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

220. Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

221. The individual Defendants, with malice and knowing that probable cause did not exist to arrest Mr. Kamara and prosecute him for the Taylor murder and related crime of unlawfully carrying a firearm, acting individually and in concert, caused Mr. Kamara to be arrested, charged, and prosecuted for those crimes, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures.

222.    Specifically, the individual Defendants, acting individually and in concert, initiated a prosecution based on fabricated evidence, fabricated evidence to undermine an alibi, and intentionally withheld exculpatory and impeachment evidence that proved a lack of probable cause.

223.    The individual Defendants, acting individually and in concert, also initiated a prosecution despite actual and constructive knowledge that Mr. Kamara was innocent.

224.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Kamara's clearly established constitutional rights.

225.    No reasonable officer in 1991 would have believed this conduct was lawful.

226.    The prosecution terminated in Mr. Kamara's favor on March 22, 2023, when the prosecution entered a *nolle prosequi*, causing all charges to be dismissed.

227.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent nearly fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT III: 42 U.S.C. § 1983 Civil Rights Conspiracy**

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

228.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

229.    The individual Defendants, along with witnesses they prevailed upon to offer false evidence and others yet unknown, agreed among themselves to act in concert to deprive Mr. Kamara of his clearly established constitutional rights, including his right not to be deprived

of liberty without due process of law and his right to be free from unreasonable searches and seizures.

230.    The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Kamara's injuries. These Defendants all knew, or should have known, that their conduct would result in Mr. Kamara's wrongful arrest, prosecution, conviction, and incarceration.

231.    No reasonable officer in 1991 would have believed this conduct was lawful.

232.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent nearly fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IV: 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Defendants Spellman and Flynn*

233.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

234.    Mr. Kamara's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration were caused by the unconstitutional action and inaction of Defendants Spellman and Flynn acting in their individual capacities and under color of law.

235.    Defendants Spellman and Flynn directly participated in the misconduct that resulted in Mr. Kamara's wrongful conviction. Among other things, Defendants Spellman and Flynn directed, approved, and/or acquiesced to the use of impermissible suggestion, pressure, and coercion to obtain unreliable identifications, to the feeding of facts to witnesses, to reports containing fabricated evidence, and to the suppression of exculpatory and impeachment evidence. Defendants Spellman and Flynn knew that the evidence implicating Mr. Kamara was

unreliable and false and that any identification of Mr. Kamara was only the result of impermissible suggestion, pressure, and coercion by the individual Defendants.

236.    Defendants Spellman and Flynn knowingly refused to terminate the wrongful prosecution of Mr. Kamara, which he knew or should have known had been initiated based on fabricated evidence and in spite of suppressed exculpatory and impeachment information. As a result, Defendants Spellman and Flynn knew or reasonably should have known that Mr. Kamara's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

237.    Defendants Spellman and Flynn culpably failed to adequately train, supervise, discipline, and/or control their subordinates, including the other individual Defendants, who ignored evidence suggesting Mr. Kamara's innocence, fabricated evidence through suggestion, pressure, and coercion, fabricated police reports (including ones designed to undermine Mr. Kamara's alibi), and suppressed exculpatory and impeachment information.

238.    Defendants Spellman and Flynn's failure to train, supervise, discipline and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Mr. Kamara's constitutional rights, encouraged and permitted their subordinates to fabricate and coerce evidence, fail to document and disclose exculpatory and impeachment evidence, and ignore evidence suggesting Mr. Kamara's innocence.

239.    No reasonable officer, including any supervisory officer, in 1991 would have believed this conduct was lawful.

240.    As a direct and proximate result of Defendants Spellman and Flynn's actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent

nearly fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT V: 42 U.S.C. § 1983 Municipal Liability Claim

*Against Defendant City of Boston*

241.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

242.    Defendant City of Boston, with deliberate indifference, adopted and/or acquiesced in policies, patterns, practices, and customs that were a moving force in the violation of Mr. Kamara's constitutional rights.

243.    Defendant City of Boston, with deliberate indifference, failed to properly train, supervise and/or discipline officers and, as such, was a moving force in the violations of Mr. Kamara's constitutional rights.

244.    At all times relevant to this case, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals being investigated for potential criminal activity, such as Mr. Kamara, were routinely deprived of exculpatory and impeachment evidence, were subjected to criminal proceedings based on false and fabricated evidence, and were deprived of their liberty without probable cause and without due process, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

245.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material

exculpatory and impeachment evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

246.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

247.    The misconduct in this case was undertaken pursuant to the customs of Defendant City of Boston.

248.    Policymakers had actual and constructive knowledge of the unconstitutional customs of the BPD but were deliberately indifferent to them.

249.    Policymakers had actual and constrictive knowledge of the constitutionally deficient training, supervision, and discipline in the BPD, but were deliberately indifferent to them.

250.    The policies, patterns, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Mr. Kamara to suffer the grievous and permanent injuries and damages set forth above.

**COUNT VI: Malicious Prosecution under Massachusetts Law**

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

251.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

252.    The individual Defendants initiated or continued proceedings against Mr. Kamara, without probable cause, with malice or specific intent to injure.

253.    The judicial proceedings against Mr. Kamara were terminated in his favor, in a manner indicative of his innocence, when his convictions were vacated and the Commonwealth of Massachusetts entered a *nolle prosequi*, causing all charges to be dismissed.

254.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent almost fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII: Negligence

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

255.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

256.    The individual Defendants owed Mr. Kamara a duty of exercising reasonable care during their investigation.

257.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

258.    The individual Defendants owed Mr. Kamara a duty to refrain from framing him for a crime he had not committed.

259.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

260.    The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Mr. Kamara's clear innocence.

261.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent

nearly fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VIII: Intentional Infliction of Emotional Distress

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

262.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

263.    The actions and omissions of the individual Defendants set forth above were extreme and outrageous. These actions and omissions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that they would cause, severe emotional distress to Mr. Kamara, as is more fully alleged above.

264.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara suffered severe emotional distress.

265.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent nearly fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above, which include physical harm.

## COUNT IX: Negligent Infliction of Emotional Distress

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

266.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

267.    The individual Defendants owed Mr. Kamara a duty of exercising reasonable care during their investigation.

268.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

269.    The individual Defendants owed Mr. Kamara a duty to refrain from framing him for a crime he had not committed.

270.    In the manner described more fully above, the actions and omissions of the individual Defendants breached this duty.

271.    The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that the individual Defendants' actions and omissions would cause any reasonable person, including Mr. Kamara, emotional distress.

272.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara suffered emotional distress.

273.    As a direct and proximate result of the individual Defendants' actions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent almost fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above, which include physical harm.

### COUNT X: Violation of Mass. Gen. Laws, c. 12, § 11H

*Against Defendants Ahearn, Davis, Doyle, Flynn, Harris, Murray, Spellman, and Tinlan*

274.    Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

275.    Through their conduct described above, including threats, intimidation, or coercion, which conduct was objectively unreasonable and/or knowingly unlawful, the individual Defendants interfered with Mr. Kamara's exercise and enjoyment of rights guaranteed to him by the United States Constitution and the constitution and laws of the Commonwealth of Massachusetts, and by federal and state laws.

276.     As a direct and proximate result of the individual Defendants' actions and omissions, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent almost fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT XI: Negligent Hiring, Training, and Supervision

*Against Defendant City of Boston*

277.     Mr. Kamara hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

278.     While committing the misconduct alleged in the preceding paragraphs, the individual Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

279.     The City had a duty to exercise reasonable care in the hiring, retention, training, supervision, and discipline of its employees, all of whom regularly interacted with members of the public.

280.     The City breached that duty because it was aware or should have become aware of widespread and recurring problems with detectives and officers of the BPD—problems which foreseeably led to citizens being denied their constitutional and other rights and being wrongfully prosecuted and convicted—but the City failed to take adequate action to ameliorate those problems, such as investigating, disciplining, discharging, or reassigning the detectives and officers.

281.     As a direct and proximate result of the City's negligent hiring, training, supervision, and discipline, Mr. Kamara was wrongly prosecuted, convicted, and imprisoned for nearly eighteen years, spent almost fourteen years on parole, and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT XII:** *Respondeat Superior* **Pursuant to Mass. Gen. Laws c. 258, § 2**

*Against Defendant City of Boston*

282.    Mr. Kamara hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

283.    While committing the misconduct alleged in the preceding paragraphs, the individual Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

284.    Defendant City of Boston is liable as principal for all torts committed by its agents.

285.    Pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the vicarious liability asserted in this Count does not apply to the federal-law claims brought pursuant to 42 U.S.C. § 1983.

286.    Pursuant to Mass. Gen. Laws. c. 258, § 10, the vicarious liability asserted in this Count does not apply to the state-law claims for malicious prosecution and intentional infliction of emotional distress.

## PRAYER FOR RELIEF

287.    WHEREFORE, Mr. Kamara demands judgment jointly and severally against Defendants as follows:

   a.  That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

   b.  That the Court award punitive damages to him, and against all individual Defendants, in their individual capacity, in an amount to be determined at trial, that will deter such conduct in the future;

     c.    For pre-judgment and post-judgment interest and recovery of his costs, including

          reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 as well as any other

          applicable laws; and

     d.    For any and all other relief to which he may be entitled.

Dated this 6th day of March, 2026.

                              Respectfully submitted,

                              By:      /s/ Anna Benvenutti Hoffmann
                                    Anna Benvenutti Hoffmann (BBO #660595)
                                    Nick Brustin*
                                    Mary Katherine McCarthy*
                                    Katherine Cion*
                                    NEUFELD SCHECK BRUSTIN
                                    HOFFMANN & FREUDENBERGER, LLP
                                    200 Varick Street, Suite 800
                                    New York, NY 10014
                                    anna@nsbhf.com
                                    nick@nsbhf.com
                                    katie@nsbhf.com
                                    kcion@nsbhf.com
                                    Phone: (212) 965-9081

                              By:      /s/ John J. Barter
                                    John J. Barter (BBO #032150)
                                    83 Atlantic Avenue, Suite 300
                                    Boston, MA 02110
                                    barterj@msn.com
                                    Phone: (617) 367-2545

                              By:      /s/ Amy M. Belger
                                    Amy M. Belger (BBO #629694)
                                    2125 Washington Street
                                    Holliston, MA 01746
                                    appellatedefender@gmail.com
                                    Phone: (917) 558-3120

                                    * *Pro hac vice* applications forthcoming

                                  *Attorneys for Plaintiff Barry Kamara*