# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY KAMARA,<br><br>     Plaintiff,<br><br> v.<br><br>CITY OF BOSTON; and ROBERT AHEARN, BENJAMIN DAVIS, JAMES DOYLE, DANIEL FLYNN, DENNIS HARRIS, TIMOTHY MURRAY, HERBERT SPELLMAN, ROBERT TINLAN, *in their individual capacities*,<br><br>     Defendants. | Civil Action No. 26-cv-11161<br><br>**PLAINTIFF'S OPPOSITION TO THE CITY OF BOSTON'S MOTION TO DISMISS**<br><br>Leave to file granted on May 6, 2026 |

**PLAINTIFF'S OPPOSITION TO THE CITY OF BOSTON'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD........................................................................................................... 2

FACTUAL ALLEGATIONS ............................................................................................... 3

ARGUMENT........................................................................................................................ 8

I.    The Court should reject the City's citationless effort to close the courthouse doors to wrongfully convicted plaintiffs.............................................................................. 8

II.   Mr. Kamara has plausibly stated a *Monell* claim against the City, under two separate theories approved by the First Circuit. ......................................................... 8

    A.    Mr. Kamara has stated a plausible claim under the municipal-custom theory. .............. 9

    B.    Mr. Kamara has stated a plausible claim under the failure-to-train, failure-to-supervise, and failure-to-discipline theory. ................................................................ 13

III.  Mr. Kamara's negligence claims should not be dismissed on "presentment" grounds. ......... 20

    A.    The state-law presentment requirement doesn't apply in federal court. ....................... 20

    B.    Mr. Kamara satisfied the presentment requirement. ..................................................... 21

IV.   The City's arguments about "*respondeat superior*" are misplaced and wrong. ..................... 24

CONCLUSION.................................................................................................................... 25

**INTRODUCTION**

Plaintiff, Barry Kamara, was convicted of a 1991 murder. He is completely innocent. His convictions have been vacated and expunged, and the District Attorney's Office has acknowledged he was *wrongfully* convicted. In this civil-rights suit, Mr. Kamara alleges he was framed by officers in the Boston Police Department ("BPD"). Relevant to the present motion, Mr. Kamara alleges those officers acted pursuant to the customs of the 1990s-era BPD, which was deliberately indifferent in failing to train, supervise, and discipline its officers, making the City of Boston liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

In a longshot attempt to avoid accountability, the City moves to dismiss, insisting these allegations are implausible. That's a meritless argument, given the: extensive line of wrongful convictions that occurred around the time Mr. Kamara was framed (which were caused by fabricating evidence and suppressing evidence); conclusions by federal and state investigators that looked into BPD wrongdoing; admissions by high-ranking BPD officials that the department enforced a "blue wall" of silence that condoned police misconduct; admissions that BPD's internal affairs "whitewashed" investigations to cover up misconduct; admissions that "[o]n the issue of wrongful convictions, there were really systemic issues"; admissions that fabricating evidence was "accepted practice," "not uncommon," and "done all the time"; widespread publicity of police misconduct that was followed by no discipline (and sometimes by *promotions*); and more.

In *Haley v. City of Boston*, the First Circuit held that *Monell* allegations far less detailed than Mr. Kamara's plausibly stated a claim. 657 F.3d 39, 52 (1st Cir. 2011). That result must be reached in this case too, just as it was in several cases in which the City tried to have *Monell* claims based on BPD misconduct dismissed at the pleading stage. *See Mazza v. City of Bos.*, 753 F. Supp. 3d 88, 94–95 (D. Mass. 2024), *Brown v. City of Boston*, No. 24-cv-12687, 2025 WL 2420967, at *3–5 (D. Mass. Aug. 21, 2025), and *Pope v. City of Boston*, No. 24-cv-10980, 2024 WL 4712857, at

*2–4 (D. Mass. Nov. 7, 2024). The City didn't even try to distinguish these cases, because no meaningful distinction can be made.[1] The notable exception to this line is *Qualls v. Roache*, No. 23-cv-10435, 2024 WL 1333610 (D. Mass. Mar. 28, 2024). Because Your Honor presided over that case, the Court is aware of the enormous differences between that complaint and Mr. Kamara's.[2] The City's heavy reliance on *Qualls*, and failure to even acknowledge *Haley*, betrays the weakness of its motion. The City's motion should be denied.

## LEGAL STANDARD

The legal standard was stated by this Court in *Miller v. Sonus Networks, Inc.*, 636 F. Supp. 3d 245, 250–51 (D. Mass. 2022). The Court must accept Mr. Kamara's well-pleaded factual allegations as true, draw all reasonable inferences in his favor, and ask only whether he has made out a case that is "plausible on its face." *Id*. Courts "may not disregard factual allegations even if it strikes a savvy judge that actual proof of those facts is improbable." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (cleaned up). A complaint, viewed holistically, need only contain facts sufficient to provide defendants with fair notice and create "a reasonable expectation that discovery may yield evidence" to support the claims. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). Courts must take "into account whether discovery can reasonably be expected to fill any holes in the pleader's case," giving latitude when "a material part of the information needed is likely to be within the defendant's control." *Id.* at 104–05. And plaintiffs

---

[1] Other cities in this district have also had this same meritless argument rejected. *E.g.*, *Caldwell v. Cambra*, No. 24-cv-12924, 2025 WL 2617906, at *17–19 (D. Mass. Sept. 10, 2025) (Brockton); *Perrot v. Kelly*, No. 18-cv-10147, 2023 WL 2939277, at *19–21 (D. Mass. Feb. 15, 2023) (Springfield), *report and recommendation adopted,* 2023 WL 2607763 (D. Mass. Mar. 23, 2023); *Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 91–92 (D. Mass. 2019) (Worcester); *Echavarria v. Roach*, No. 16-cv-11118, 2017 WL 3928270, at *4–5 (D. Mass. Sept. 7, 2017) (Lynn).

[2] 25 pages is not enough to fully describe Mr. Kamara's careful allegations. We respectfully ask the Court to read paragraphs 128 through 207 of the Amended Complaint (Dkt. 13).

may allege facts on "information and belief" when those facts are within the possession of the defendant or the belief is based on information that makes the inference plausible. *See, e.g.*, *Canas v. Brama 1 Inc.*, No. 23-cv-11762, 2025 WL 2792975, at *3 (D. Mass. Sept. 30, 2025).

### FACTUAL ALLEGATIONS

Barry Kamara is innocent. ¶¶ 1–2, 13–18, 40–47.[3] As the District Attorney admitted, Mr. Kamara was *wrongfully* convicted; his convictions have been vacated and expunged. ¶¶ 16–18. BPD officers framed him for the crime (a murder). ¶¶ 3, 7–10, 48–99. Those officers used improper pressure, suggestion, and coercion to fabricate two false eyewitness identifications, and they suppressed evidence demonstrating Mr. Kamara's innocence, including: the initial description of the perpetrator given by one of the eyewitnesses; the fact that an eyewitness identified a different man, not Mr. Kamara, as the perpetrator; the fact an eyewitness had to be subjected to multiple identification procedures before she gave evidence incriminating Mr. Kamara; and the fact that the victim's own mother said someone else, not Mr. Kamara, was involved with her son's murder. *Id*. Defendant Doyle even explicitly admitted he suspected someone else was the killer but was content to prosecute Mr. Kamara anyway. ¶ 91. Indeed, two days before anyone implicated Mr. Kamara in this crime, Defendants had baselessly declared him to be their "prime suspect" in a *different* murder (another one Mr. Kamara did not commit). ¶ 59. Defendants were set on convicting Mr. Kamara of a murder—*any* murder. ¶ 60.

The false identifications were procured by tactics including: (i) pressing witnesses who only saw portions of the perpetrator's face for mere seconds to identify someone despite their inability to do so, ¶¶ 48–56; (ii) forcing a witness who had identified a different person as the perpetrator to undergo repeated identification procedures until he incriminated Mr. Kamara, ¶¶ 62–69;

---

[3] Citations are to the numbered paragraphs of the amended complaint (Dkt. 13).

(iii) promising not to pursue valid criminal charges against a witness if he incriminated Mr. Kamara, *id*.; and (iv) feeding a witness fabricated descriptions of the perpetrator, and responding to a *question* about Mr. Kamara by telling the witness "you got the right guy," ¶¶ 72, 74–83.

Mr. Kamara has sued the City because the City is legally responsible for the BPD and the BPD was the moving force behind Mr. Kamara's wrongful conviction. ¶¶ 26, 152, 241–50. Mr. Kamara was targeted because he was a young Black teen who the BPD thought was insufficiently deferential to the police, and who the BPD wrongly believed was a gang member. ¶¶ 57–60. It was customary in the 1990s for the BPD to target such men and boys. ¶ 131.

Moreover, the officers who framed Mr. Kamara did not go rogue—they acted *pursuant to* the customs of the 1990s-era BPD. ¶¶ 10–11, 128–207. Specifically, the BPD had a custom of creating false eyewitness identifications. ¶ 129. As in this case, under the custom, "[i]ndividual 'witnesses' who had little or no information about a crime were subjected to repeated police intervention, and the witnesses were incentivized and intimidated into making identifications of individuals whom the police chose as their suspects." *Id.* And when officers in this case buried exculpatory evidence, including the fact that *every* witness either identified or described a *different* man, not Mr. Kamara, the officers were acting in accordance with BPD custom by "suppressing exculpatory and impeachment evidence, particularly evidence that implicated suspects other than the BPD's chosen target." ¶ 130. Although this conduct is egregious and unconstitutional, the officers engaged in it freely "because they knew they could get away with it, due to the BPD's longstanding…customs of looking the other way when officers engaged in misconduct." ¶ 11.

Even at the pleading stage, Mr. Kamara's allegations are highly specific, including identifying evidence likely to be developed when discovery opens. For example, near the same time Mr. Kamara was framed, "the Massachusetts Attorney General released a comprehensive

4

report detailing BPD misconduct during the now-infamous investigation into the murder of Carol Stuart." ¶ 193. In the public report, "[t]he Attorney General explained…that his team had 'found a broad pattern of infringement of individual rights.'" *Id.* That report is corroborated by a BPD Superintendent who admitted, around the time Defendants framed Mr. Kamara, "On the issue of wrongful convictions, there were really systemic issues. The police were part of that." ¶ 179.

Given the widespread customs of fabricating and suppressing evidence, it's unsurprising that the 1990s-era BPD also suffered from an "obvious lack of training, supervision, and discipline." ¶ 178. After reviewing internal BPD files from the 1980s into the late 90s, the Boston Globe reported a "blue wall" or code of silence and a failure to properly investigate claims of officer misconduct. ¶ 138.[4] That was corroborated by mayor Kim Janey when she admitted that "a blue wall of silence was confirmed" during an investigation into police misconduct from the early 1990s. ¶ 147. Official reports documented that BPD created an "unnecessarily dangerous situation for the citizens of the City of Boston" through its "grossly inadequate training, supervision, and

---

[4] The City's complaint that newspaper articles are hearsay, Dkt. 20 at 6–7, is misplaced. We are at the motion-to-dismiss stage, where no evidence is required—so the label "inadmissible" makes no sense. The quote the City included in its brief actually comes from two cases decided *at summary judgment*. *Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138, 150 (D.D.C. 2020) (quoting *Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005)).

The City also argues that some of the articles could not have put the City on notice because they were published after Defendants framed Mr. Kamara. Dkt. 20 at 7. The City misses the point. The articles show that Mr. Kamara's core allegation—that what happened to him was not an aberration but was in line with the BPD's customs—is plausible, which is the only question at this stage. Through discovery, we will develop admissible evidence to prove his allegations are *true*. The subset of articles that predate the framing of Mr. Kamara serve the *additional* purpose of showing the City was on notice of widespread misconduct.

Moreover, even events post-dating Mr. Kamara's wrongful conviction are probative and relevant to his *Monell* claim. *E.g.*, *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) (holding police misconduct post-dating the incident involving the plaintiff was relevant to a *Monell* claim, rejecting "the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on such an issue"); *Bordanaro v. McLeod*, 871 F.2d 1151, 1166–67 (1st Cir. 1989); *Brown*, 2025 WL 2420967, at *4.

discipline" (including "virtually nonexistent" training for detectives), ¶ 197, and "that the BPD had no formal system in place to identify officers with repeated complaints filed against them, nor any ability to identify troublesome patterns of behavior." ¶ 199. The supervision and discipline were found to be so inadequate "that one BPD officer remained on the job despite being the subject of 30 complaints; and another remained on the job despite 28 complaints." *Id.*

Because of the BPD's unconstitutional customs and deliberately indifferent refusal to train, supervise, and discipline, "[t]ime and again, innocent men were convicted of serious offenses…and imprisoned for decades[.]" ¶ 129. The complaint listed a tragic number of these men, all framed around the same time as Mr. Kamara: Joseph Jabir Pope,[5] Albert Brown,[6] Carlos Montilla,[7] Shawn Drumgold,[8] Marvin Mitchell,[9] Christopher Harding,[10] Neil Miller,[11] Anthony

---

[5] As here, BPD officers in Pope's case "fabricated the only evidence against Mr. Pope" and "purposefully ignored credible leads pointing to another suspect[.]" ¶ 7, 154.

[6] Engaging in the same misconduct described in note 5, BPD officers also "fabricated an eyewitness identification by using an unduly suggestive identification procedure[,]" ¶ 155, as they did in Mr. Kamara's case. ¶¶ 66–69.

[7] BPD officers "fabricated from top to bottom" this case against Montilla as they "had a personal vendetta against him." ¶ 156. BPD officers in Mr. Kamara's case similarly "disliked him." ¶ 58. The officers in Montilla's case, as in Mr. Kamara's, also "withheld substantial exculpatory and impeachment evidence[.]" ¶¶ 70–77, 156.

[8] Drumgold's case involves fabricated evidence where BPD officers intimidated witnesses "into providing false testimony[,]" despite the witnesses admitting they could not identify Mr. Drumgold as the perpetrator. ¶ 157. BPD officers did the same with the only witnesses against Mr. Kamara. ¶¶ 51–53. The officers in Drumgold's case also ignored witness testimony pointing to the real perpetrator, just as they did in Mr. Kamara's case. ¶¶ 84–86, 157.

[9] In Mitchell's case, BPD officers falsely claimed Mr. Mitchell "admitted to wearing pink pants on the day in question" since the officers believed the perpetrator was wearing pink pants. ¶ 158. The BPD officers in Mr. Kamara's case similarly "claimed they found a .38-caliber bullet in Mr. Kamara's house," despite that being "completely false." ¶ 101.

[10] Harding's case involved "fabricated evidence" by "[a]t least three BPD officers" who also "suppressed exculpatory evidence", ¶ 159, just as BPD officers did in the present case, ¶¶ 7–8.

[11] As in Mr. Kamara's case, ¶ 7, "BPD officers used improperly suggestive identification procedures to fabricate identifications of Mr. Miller[,]" ¶ 160.

Powell,[12] Robert Foxworth,[13] James Lucien,[14] Sean Ellis,[15] Donnell Johnson,[16] and Marlon Passley[17].[18] The BPD's unconstitutional customs and failure to train, supervise, and discipline have strong roots as these practices stretch back to at least 1969, as evidenced by the wrongful convictions of Paul Robinson, James Haley, Bobby Joe Leaster, Lawyer Johnson, Anthony Mazza, Tyrone Clark, Ella Mae Ellison, Laurence Adams, Milton Jones, Raymond Gaines, Frederick Clay, James Watson, Ulysses Charles, and Louis Santos. ¶ 180.

---

[12] As here, in Powell's case, "BPD officers used improperly suggestive identification procedures that caused the victim to falsely identify Mr. Powell[,]" and "supervisors failed to properly supervise officers under their command." ¶¶ 7–8, 10, 161.

[13] Just like this case, Foxworth's involved "suppressed evidence…of one of the true perpetrators" being identified by someone close to the crime, and "suppress[ion of] powerful exculpatory evidence…identifying the real killer." ¶¶ 84–88, 162.

[14] As in this case, Lucien's case involved "fabricated evidence" that "exculpate[d] the likely real killer[.]" ¶¶ 7, 9, 86, 166.

[15] In Ellis's case, "a purported eyewitness was brought into the Homicide Unit where detectives presented her with photo arrays. When she failed to identify Ellis on her own, detectives coerced her into a false identification" and "later suppressed exculpatory evidence[.]" ¶ 169. BPD officers did that here too. ¶¶ 48–57.

[16] As here, Johnson's case involved the suppression of "exculpatory evidence and fabricat[ion of] a false story[.]" ¶¶ 7, 68–69, 170.

[17] Passley's case involves "*four* eyewitness[]" identifications, identifying Mr. Passley despite the later confession of the real perpetrator. ¶ 171. As in Mr. Kamara's case, "BPD officers engaged in improper suggestion, pressure, and/or coercion." ¶¶ 7–8, 171.

[18] The complaint also listed Ronnie Qualls. The City argues that Mr. Qualls's case was unsuccessful so it cannot support a *Monell* claim. Dkt. 20 at 12. While Mr. Qualls's inability to prosecute his case does not mean his allegations were untrue, Mr. Kamara cited *numerous* wrongful convictions and the plausibility of his allegations does not turn on Mr. Qualls's case.

The City also makes the extraordinary suggestion that William Bennett's case lacked merit. Dkt. 20 at 12. But it's widely known that the City formally apologized to Mr. Bennett and paid him $100,000. That it took the City decades to acknowledge the police misconduct does not mean no misconduct occurred. Similarly, the City says Donnell Johnson's unsuccessful civil case cannot support Mr. Kamara's *Monell* allegations. Dkt. 20 at 12. But the officers in that case suppressed exculpatory evidence and lied under oath. Although their conduct was described as "improper and reprehensible," they won the civil suit because, on the unique facts of that case, their misconduct did not cause any prejudice. *See Johnson v. Mahoney*, 424 F.3d 83, 91 (1st Cir. 2005).

## ARGUMENT

**I.    The Court should reject the City's citationless effort to close the courthouse doors to wrongfully convicted plaintiffs.**

The City says this suit should be dismissed because the criminal prosecution did not end in Mr. Kamara's favor. Dkt. 20 at 4. That argument, supported by the City's "belie[f]," *id*. at 5, contradicts binding precedent. Mr. Kamara's convictions were vacated and the prosecution entered a *nolle prosequi*. ¶¶ 126–27. That satisfies the favorable-termination rule, which requires only that the "prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022).

The City's new rule—that a case terminates favorably only if it ends "shortly after prosecution began and prior to any trial," Dkt. 20 at 5—is contrary to Supreme Court and First Circuit precedent. *Heck v. Humphrey*, which the City cited, listed several ways a prosecution could proceed through trial, including a *conviction*, and still end favorably for the defendant: the conviction could be "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 487 (1994). The Court has held that an acquittal—which doesn't happen "prior to any trial" as the City would require—"was unquestionably a favorable termination." *McDonough v. Smith*, 588 U.S. 109, 125 n.10 (2019). And the City ignores First Circuit cases in which the plaintiff was convicted and brought suit decades later, only after his conviction was invalidated. *E.g.*, *Drumgold v. Callahan*, 707 F.3d 28, 32 (1st Cir. 2013); *Haley*, 657 F.3d at 45; *Limone v. Condon*, 372 F.3d 39, 50–52 (1st Cir. 2004). Notwithstanding the City's "belie[f]," Mr. Kamara has satisfied the favorable-termination rule.

**II.    Mr. Kamara has plausibly stated a *Monell* claim against the City, under two separate theories approved by the First Circuit.**

Mr. Kamara pleaded two *Monell* theories. First, the City "with deliberate indifference, adopted…customs that were a moving force in the violation of Mr. Kamara's constitutional

rights." ¶ 242. And second, the City "with deliberate indifference, failed to properly train, supervise and/or discipline officers and, as such, was a moving force in the violations of Mr. Kamara's constitutional rights." ¶ 243. These are "two separate *Monell*-type claims, each demanding a different kind of proof." *Haley*, 657 F.3d at 51.

### A.    Mr. Kamara has stated a plausible claim under the municipal-custom theory.

As the Supreme Court held in *Monell* itself, municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91. To succeed on such a claim, a plaintiff must (1) identify a municipal custom that caused his injury, and (2) demonstrate that the municipality, "through its deliberate conduct," was the "moving force behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997). That standard is satisfied where the custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Baron v. Suffolk Cnty. Sheriff's Dep't*, 402 F.3d 225, 236–37 (1st Cir. 2005). Such conduct satisfies the standard because it shows the municipality acted "with deliberate indifference" to the custom's "known or obvious consequences." *Bryan County*, 520 U.S. at 407; *see also Haley*, 657 F.3d at 53 (liability appropriate where the municipality "encouraged, or at least tolerated," the custom).

Mr. Kamara's complaint easily clears this bar. It is replete with detailed allegations regarding the 1990s-era BPD's unconstitutional customs. *See* ¶¶ 128–207. Mr. Kamara alleged that the BPD had a custom of fabricating evidence against its chosen targets. ¶ 129. In particular, the BPD had a custom of creating false witness identifications. *Id.* Pursuant to that custom, "'witnesses' who had little or no information about a crime were subjected to repeated police intervention, and the witnesses were incentivized and intimidated into making identifications of individuals whom the

9

police chose as their suspects." *Id.* Mr. Kamara also alleged the BPD had a "custom of suppressing exculpatory and impeachment evidence[.]" ¶ 130. Those customs were followed by the detectives in this case, making the City the "moving force" behind Mr. Kamara's wrongful conviction. ¶¶ 128, 152, 242, 245, 250. Mr. Kamara further alleged the City knew of this widespread misconduct but, demonstrating "deliberate indifference to the misconduct," took no steps to prevent officers from engaging in it, allowing the custom to become "so well settled as to constitute the *de facto* policy of the City of Boston." ¶¶ 151–52, 246.

The legal standard weeds out only "conclus[ory]" allegations, *Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 546 (D. Mass. 2018) (O'Toole, J.), and even allegations "couched in general terms" clear that low bar, *Haley*, 657 F.3d at 53, but Mr. Kamara's allegations were detailed. For example, the plausibility of his allegations is supported by statements from a BPD Commissioner, a Boston mayor, legal counsel to the BPD, and a Massachusetts state prosecutor—who all made those statements about the BPD during the relevant time. ¶¶ 137, 147, 150, 193. *Cf. Baron*, 402 F.3d 237–38 (holding that jury verdict on *Monell* claim was adequately supported by one official's testimony that a custom existed, notwithstanding contrary testimony from other witnesses).

Mr. Kamara alleged that this unconstitutional approach to policing was supported at the very top of the BPD. ¶¶ 152, 242–43, 246. He included specific facts that demonstrate the plausibility of that allegation. For example, when the BPD Commissioner learned that BPD officers fabricated critical evidence in a murder investigation, the Commissioner "decided to 'sit on' that information…expect[ing] the problem would just 'go away.'" ¶ 189(a)–(d). Moreover, supported by a BPD officer's admission to the Boston Globe, Mr. Kamara alleged that fabricating evidence was an "accepted practice" that was taught to junior officers by more senior ones. ¶ 189(e). That officer explained that when he covered up his misconduct, he "was acting at the behest of his

10

superiors." *Id*. Mr. Kamara included another example of a high-level BPD official fabricating evidence: when a deputy superintendent sexually harassed a woman who wanted to become a police officer, the BPD's legal advisor fabricated information that a witness had recanted, so the deputy superintendent's version of events would be believed. ¶ 143. (In Mr. Kamara's case, Defendants fabricated information to undermine the credibility of Mr. Kamara's alibi witnesses, so Defendants' version of events would be credited. ¶¶ 89–90.)

BPD's fabrication of evidence in murder investigations led to multiple investigations of the BPD. One federal investigation found "that BPD detectives 'pressured witnesses to give false information, threatened witnesses, and included false coerced information in search warrant affidavits.'" ¶ 193. Despite these disturbing reports of BPD misconduct, the Commissioner and mayor "publicly stood firmly behind BPD officers." ¶ 194. The BPD's own internal investigation was a whitewash, "spinning that officers' threats to witnesses were mere attempts at humor, and their incidents of including false information in warrant applications were mere paperwork snafus." ¶ 195. The BPD refused to turn over the records of its investigation until the state's highest court ordered it to do so; those records showed the BPD chose *not* to investigate its officers' fabrication of evidence: "the issue at the crux of the controversy—how witnesses were able to supply information known only to police and the killer—was barely addressed." ¶ 196.

In the face of these specific and detailed allegations, the conclusion that the City's motion must be denied is unavoidable. That is especially clear because the First Circuit held as much in another wrongful-conviction case about the BPD (where the allegations were far less detailed). In that case, James Haley's murder conviction was overturned when it was discovered that BPD detectives had withheld exculpatory and impeaching evidence. *Haley*, 657 F.3d at 45. Mr. Haley sued the City, alleging the detectives' wrongdoing was caused by a "standing (if unannounced)

11

policy of nondisclosure that prevailed at the BPD." *Id.* at 51. The district court granted the City's motion to dismiss but the First Circuit reversed. *Id.* at 51–53. In response to the City's position that a custom of withholding exculpatory evidence was implausible, the court bluntly wrote that the City's argument "elevate[d] hope over reason." *Id.* at 52.

Although not intending to be exhaustive, the *Haley* court identified two reasons why a BPD custom of withholding exculpatory evidence was plausible. The first reason was the sheer "volume of cases involving nondisclosure of exculpatory information." *Id.* at 53. That reason applies more forcefully now, as more instances of nondisclosure have come to light. *See* ¶¶ 154–71.[19] The second reason was that if BPD officers suppressed exculpatory evidence, they did so in the face of universal condemnation of that practice by courts; and because officers aren't likely to ignore courts all on their own, their defiance makes it "entirely plausible that their conduct was encouraged, or at least tolerated, by the BPD." *Haley*, 657 F.3d at 53; *see also Caldwell*, 2025 WL 2617906, at *18. This reason also applies forcefully here, because at least one of the officers explicitly admitted he was willing to frame Mr. Kamara. ¶ 91. It's "entirely plausible" that he felt

---

[19] The City tries to benefit from the fact that the BPD-framed people referenced in paragraphs 154 through 171 spent decades wrongfully incarcerated before being exonerated: the City argues that it couldn't have been on notice of BPD wrongdoing until the exonerations. Dkt. 20 at 12. The City misses the point. It's not easy to convince a jury beyond a reasonable doubt that an innocent person committed a crime. The extraordinary number of wrongful convictions demonstrates the plausibility of Mr. Kamara's allegations that the City had a widespread custom of fabricating evidence, creating false identifications, and suppressing exculpatory evidence.

In short, the "volume of cases involving nondisclosure" defeated the City's motion to dismiss in *Haley*, and that volume is greater now. *See also Foley*, 948 F.2d at 14–15 ("Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question." (quoting, in parenthetical, *Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986))); *Kibbe v. City of Springfield*, 777 F.2d 801, 807 (1st Cir. 1985) ("widespread activity" is likely to "reflect the operating procedures of the police department"); *Huffman v. City of Boston*, No. 21-cv-10986, 2025 WL 2778035, at *12 (D. Mass. Sept. 29, 2025) ("multiple instances of misconduct" suggesting a "systemic pattern" support an inference of a custom (cleaned up)).

free to so brazenly ignore the Constitution because doing so was the standard practice of his department. *See, e.g.*, *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) (in *Monell* case, noting that "the lack of restraint the police officers exhibited…suggested the existence of an official policy"); *id.* at 16 (similar).

Additionally, Mr. Kamara was not framed by one bad apple—multiple Defendants worked hand-in-hand to violate his constitutional rights. ¶¶ 63–64, 66, 68, 71, 78, 80, 86, 90, 98–99. That only happens in a department that is known to look the other way and enforce a blue wall of silence. ¶¶ 144, 146, 147, 149, 151–52, 194, 202. As the First Circuit has noted, when "a large contingent" of officers jointly engage in misconduct, that "provides some proof of the existence of the underlying policy or custom." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156–57 (1st Cir. 1989).

The City fails to grapple with these specific allegations, with First Circuit precedent (including *Haley*, which is not even cited in the *Monell* section of the City's brief), and with all the times the City has unsuccessfully tried to have *Monell* allegations dismissed before discovery.[20] The City's motion should be denied.

### B. Mr. Kamara has stated a plausible claim under the failure-to-train, failure-to-supervise, and failure-to-discipline theory.

The City is liable under a failure-to-train theory if "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference

---

[20] *See Mazza*, 753 F. Supp. 3d at 94–95; *Brown*, 2025 WL 2420967, at *3–5; *Pope*, 2024 WL 4712857, at *2–4. Instead of addressing these on-point cases, the City repeatedly cites *Qualls*, 2024 WL 1333610. As Your Honor knows, *Qualls* involved a barebones complaint that: (1) asserted only a failure-to-train claim, not a municipal-custom claim, *id.* at *1–2; and (2) pleaded historical misconduct that allegedly put the City on notice of the need for more training, but that misconduct was dissimilar to the plaintiff's allegations about his own case, *id.* at *2.

The City's omission of *Haley* is striking, since the City did the same thing in 2024 and was accused of bad faith, Dkt. 12, No. 24-cv-10333 (Mazza's Brief) at 8, and then did the same thing just months ago, and was again called out for it, Dkt. 28, No. 25-cv-13084 (Jones's Brief) at 14. *Haley* is a binding decision from the First Circuit—the City should not continue ignoring it.

to the unconstitutional effects of those inadequacies." *Haley*, 657 F.3d at 52. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). That's because a "policy of inaction" under those circumstances "is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61–62. The same "deliberate indifference" standard applies to failure-to-supervise and failure-to-discipline claims. *Bordanaro*, 871 F.2d at 1158–59.[21] The 1990s-era BPD was the definition of deliberately indifferent: it was a department that found a detective to be "unable to differentiate fact from fiction" but lied to cover up his mental unfitness, allowing him to remain on the force, where he framed an innocent man. ¶¶ 166–67. It was a department that violated not only the Constitution, but a judge's direct order, by denying arrested suspects their right to speak to a lawyer, and then called that egregious misconduct a mere "technicality." ¶ 191.

There are two ways to adequately allege deliberately indifferent training, supervision, and discipline: a pattern of constitutional violations caused by the inadequacies; or a showing that the particular circumstances made the risk of constitutional violations from the inadequacies "obvious." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025). Mr. Kamara states a plausible claim under both approaches.

---

[21] Plaintiffs are not required to show that the inadequacy was the *only* cause of the constitutional violation. *See Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005) ("The actions taken by Solitro that constituted excessive force must somehow have been caused—*at least in part*—by the City's failure to train, or erroneous hiring of, Solitro." (emphasis added)).

### i) Pattern of constitutional violations

The complaint details a tragic number of wrongful convictions, from the same time, caused by the same constitutional violations (fabrication, suppression, coercion, and suggestive identifications). ¶¶ 154–71. The startling number of similar violations plausibly shows that the BPD's training, supervision, and discipline were systematically deficient. *See Bordanaro*, 871 F.2d at 1162–63 ("A sufficiently supervised, properly recruited, trained and disciplined group of officers would not have acted so far below the level of accepted police behavior…. We point out that liability is levied here not because the city hired one bad apple, but because the city's police policy produced an entire barrel of bad apples." (cleaned up)); *Brown*, 2025 WL 2420967, at \*4–5 (denying motion to dismiss and noting "the complaint details six other cases…where BPD engaged in careless investigations because of inadequate training," revealing a "pattern of similar constitutional violations" involving suppression and fabrication of evidence (cleaned up)).

The complaint even specifically highlighted some of the constitutional violations that came to light *before* the framing of Mr. Kamara, indisputably putting the City on notice. These violations included the overturning of *four* wrongful convictions, the acquittal of a defendant after a BPD officer committed perjury, the finding of civil liability against BPD officers who killed a man and fabricated evidence to cover it up, and the submission of an affidavit from a witness who swore that a BPD detective promised to keep him out of jail if he provided false information against a BPD target. ¶ 187. The violations also included the "use of suggestive techniques to coax victims to identify" a BPD target. ¶ 188. And they include an officer who fabricated evidence and committed perjury, causing a guilty verdict to be thrown out—and that officer was *promoted* instead of being disciplined. ¶ 190; *see also* ¶ 192 (another officer who committed perjury and wasn't disciplined, before Mr. Kamara was framed). Mr. Kamara specifically alleged that some of the Defendants who framed him were serial offenders who were never disciplined beyond a slap

15

on the wrist. ¶¶ 162–63, 165, 170, 176–77. *See Pope*, 2024 WL 4712857, at *4 (relying on an officer's history of misconduct to find a "failure to train or discipline" claim adequately pleaded).

Additionally, the City offers no explanation for the suppression of evidence in this case, making this line from *Haley*, which reinstated a failure-to-train claim, fitting:

> Disclosure abuses are a recurring problem in criminal cases, and the BPD's failure to disclose the [exculpatory evidence] is wholly unexplained. Given the volume of cases involving nondisclosure of exculpatory information and the instant failure to disclose [evidence] that clearly would have undermined the prosecution's theory of the case, we think that the municipal liability claims pleaded by [the plaintiff] step past the line of possibility into the realm of plausibility.

657 F.3d at 53 (citation omitted).[22]

Further supporting the claim is the fact that at least one officer openly admitted the BPD was willing to frame Mr. Kamara—something he would be highly unlikely to do if BPD officers thought their misconduct might lead to discipline. ¶ 91. *See, e.g.*, *Bordanaro*, 871 F.2d at 1161. To the contrary, unafraid of discipline, several BPD officers admitted to fabricating evidence because they believed it was the "accepted practice." ¶ 189(e). In the Albert Lewin case, BPD officers openly admitted to fabricating evidence. ¶ 189. The case was covered extensively in the Boston Globe, and numerous officers gave statements backing up their colleagues, explaining that fabrication was "accepted practice," "not uncommon," and "done all the time." ¶ 189(e), (f).

Such open admission to constitutional violations would never happen in a department that wasn't deliberately indifferent to police misconduct. But these officers knew their department *was* deliberately indifferent. Indeed, speaking of BPD's internal-affairs division, a former BPD

---

[22] And again, after the First Circuit reversed the dismissal of the failure-to-train claim, discovery revealed evidence tending to prove those allegations true, and the City's summary-judgment motion was denied (leading to a prompt settlement). *See* note **Error! Bookmark not defined.**, above.

Commissioner explained, "They're not called 'whitewash alley' for nothing." ¶ 137. Another BPD Commissioner admitted that, instead of looking into police misconduct, internal affairs "would rather think of 10 reasons" *not* to investigate. ¶ 137. And Mr. Kamara pleaded that this utter failure to train, supervise, and discipline was further evidenced by officers with *dozens* of complaints against them being allowed to remain on the job. ¶¶ 140, 199. Mr. Kamara has more than adequately stated a failure-to-train, -supervise, and -discipline claim under the pattern-of-violations approach.

#### ii)   Obvious risk of constitutional violations

Mr. Kamara has also stated a claim under the "obvious risk" approach, which applies in circumstances where "a violation of federal rights" is a "highly predictable consequence" of a failure to train, supervise, or discipline. *Bryan County*, 520 U.S. at 409; *City of Canton*, 489 U.S. at 390.[23] As many courts have held, constitutional violations are "highly predictable" when detectives are not trained on their obligation to disclose exculpatory evidence. *E.g.*, *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006); *Jackson v. City of Cleveland*, 925 F.3d 793, 836–37 (6th Cir. 2019); *Echavarria v. Roach*, 565 F. Supp. 3d 51, 91 (D. Mass. 2021).[24, 25]

---

[23] In *Canton*, the Court explained that "policymakers know to a moral certainty that their *police officers* will be required to arrest fleeing felons," so the need for training in "the constitutional limitations on the use of deadly force" was "so obvious" that failing to provide that training constituted deliberate indifference. 489 U.S. at 390 n.10 (emphasis added). *Detectives*, on the other hand, don't arrest fleeing felons, but *do* discover exculpatory evidence. *See id.* at 390 ("[T]he focus must be on adequacy of the training program *in relation to the tasks the particular officers must perform*." (emphasis added)); *see also id.* at 391 (focus on "the usual and recurring situations").

[24] The plaintiff and court in *Echavarria* separated "failure to promulgate a policy" from "failure to train." *Id.* at 92. Mr. Kamara also alleged that the BPD failed to promulgate a policy, ¶¶ 204–05, but we see that as part of, not separate from, the failure to train.

[25] For more, see *Scott v. City of Tulsa, Oklahoma*, 775 F. Supp. 3d 1190, 1206–07 (N.D. Okla. 2025); *Fullman v. City of Philadelphia*, No. 24-cv-0969, 2025 WL 343691, at *6 (E.D. Pa. Jan. 30, 2025); *Campbell v. Hamilton Cnty.*, No. 22-cv-315, 2023 WL 6295803, at *9–10 (S.D. Ohio Sept. 27, 2023); *Stewart v. Coughlin*, No. 20-cv-00497, 2023 WL 121989, at *8–9 (N.D. Tex. Jan. 6, 2023); *DuBoise v. City of Tampa*, No. 21-cv-2328, 2022 WL 4761097, at *2 (M.D. Fla. Oct. 3,

The conclusion that constitutional violations are highly predictable when detectives are not trained in their disclosure obligations follows from Supreme Court precedent. In *Connick*, the Court acknowledged that "[t]here is no reason to assume that police academy applicants are familiar with [] constitutional constraints," and "in the absence of training," they will not "obtain the legal knowledge they require." 563 U.S. at 64. "Under those circumstances there is an obvious need for some form of training." *Id*. The Court held that failing to train *prosecutors* in their disclosure obligations did *not* result in an obvious risk of constitutional violations, but explicitly based that holding on the distinction between prosecutors (who are attorneys) and police officers (who are not). *Id*. at 64–67. So *Connick* implicitly endorsed the First Circuit's earlier case upholding a *Monell* verdict where the department's training "failed to address contemporary law enforcement issues" and "failed to address up-to-date standards," leaving officers without any "up-to-date direction in many police procedures." *Bordanaro*, 871 F.2d at 1159–60. As the First Circuit held, when inadequate training leaves officers "ill-prepared and ill-equipped to perform [their] *obvious and recurring duties*," a "do nothing policy" predictably "expose[s] the citizens…to imminent police misconduct, and [is] attributable to the municipality." *Id*. at 1162 (emphasis added).

Mr. Kamara's allegations easily satisfy this standard. He listed a staggering number of wrongful convictions (many caused by suppressed exculpatory evidence), ¶¶ 154–77, which "provided notice to the BPD that its existing training, supervision, and discipline were woefully inadequate." ¶ 173. He explained that a BPD detective "infamous for having committed multiple

---

2022); *Ward v. Reynolds*, No. 20-cv-00981, 2021 WL 3912803, at *6 (M.D. Tenn. Sept. 1, 2021); *Virgil v. City of Newport*, No. 16-cv-224, 2018 WL 344986, at *15 (E.D. Ky. Jan. 9, 2018); *Caminata v. Cnty. of Wexford*, No. 14-cv-203, 2015 WL 6472645, at *14–15 (W.D. Mich. Oct. 27, 2015); *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014); *Dodd v. Simmons*, No. 12-cv-0087, 2013 WL 5969607, at *25–26 (M.D. Tenn. Nov. 8, 2013); *Cristini v. City of Warren*, No. 07-cv-11141, 2012 WL 5508369, at *12–13 (E.D. Mich. Nov. 14, 2012).

18

constitutional violations" had admitted "that he and his colleagues had no guidance on how to approach investigations and constitutionally required disclosures." ¶ 186. He flagged that a former BPD legal counsel told the Boston Globe that officers were promoted to detective based on politics, not merit, leaving "unqualified and improperly trained detectives to handle cases." ¶ 150. He noted that an official report found that training for detectives was "virtually nonexistent" and the BPD's inadequate supervision and discipline created a "dangerous situation" for Boston's citizens. ¶ 197.[26] *See Brown*, 2025 WL 2420967, at *4–5 (relying in part on this same report and holding the plaintiff stated a plausible claim "that the City failed to adequately train BPD officers regarding fabrication of evidence and the mandatory disclosure of exculpatory information").

Of course, the City may, at a later stage, attempt to show that it *did* train its detectives, or that the constitutional violations underlying other wrongful convictions were *dissimilar* to what was done to Mr. Kamara. But a motion to dismiss—before any discovery has taken place—is not the time for those disputes. *Haley*, 657 F.3d at 52. A complaint need only provide a short and concise statement that puts the defendant on notice of the substance of the claims and states a claim that is plausible on its face. Courts in this district appropriately deny motions to dismiss failure-to-

---

[26] The City argues the St. Clair report should be ignored because it reflects the City's "choice to undertake an introspective review" of the BPD. Dkt. 20 at 15. That is a meritless argument. *Sheffield v. City of Boston*, 319 F.R.D. 52, 55 (D. Mass. 2016) (holding that "a report published by the BPD on its own policing practices" was "relevant to plaintiff's *Monell* claims," notwithstanding the City's plea that the report demonstrated "a proactive attempt by the BPD to analyze and reform its policies and practices").

The City also notes that the report was published after Mr. Kamara was framed. Dkt. 20 at 15–16. But the report *analyzed* the BPD's customs that pre-existed the report's publication. For example, the report explicitly discusses misconduct complaints from "the ten-year period between 1981 and 1991." ¶ 203. So the report supports the plausibility of Mr. Kamara's allegation that training was virtually nonexistent. ¶ 197. The report also shows the City had notice of its failures, because notice can come from a practice being widespread, not just the publication of a report. Because the "BPD's failures were obvious and widespread, not hard-to-notice, [] St. Clair explicitly blamed top policymakers, including the BPD Commissioner," ¶ 197—and obviously reached that conclusion before his report was published.

train, -supervise, and -discipline claims when, as here, the allegations clear that low bar. *E.g.*, *Caldwell*, 2025 WL 2617906, at *19; *Alvarez v. City of Worcester*, 450 F. Supp. 3d 74, 81 (D. Mass. 2020); *see also Monteiro v. Cormier*, No. 21-cv-4, 2023 WL 6314658, at *9 (D.R.I. Sept. 28, 2023).[27] The City's motion should be denied.

### III.   Mr. Kamara's negligence claims should not be dismissed on "presentment" grounds.

For two reasons, the Court should not apply the state-law "presentment" requirement to dismiss the negligence claims in Counts VII, IX, and XI. First, the state-law requirement doesn't apply in federal court. Second, if it does, Mr. Kamara satisfied it.

### A.    The state-law presentment requirement doesn't apply in federal court.

As the Supreme Court reaffirmed just months ago, when a state law conflicts with a Federal Rule of Civil Procedure, the state law does not apply in federal court. *Berk v. Choy*, 607 U.S. 187, 192, 199 (2026).[28] Such a conflict exists here. Specifically, Massachusetts dictates that a "civil action" against a public employer cannot be "instituted" in court unless the claim is first presented in writing to the public employer. M.G.L. c. 258, § 4. But the Federal Rules have a different answer to the question of what is required to "commence" a "civil action": the only requirement is that a complaint be filed in court. Fed. R. Civ. P. 3. That conflict means the Massachusetts rule does not apply. *Albright v. Christensen*, 24 F.4th 1039, 1046–49 (6th Cir. 2022) (holding that Michigan's

---

[27] An exception is *Mazza*, in which the municipal-custom claim survived, but the failure-to-train claim was dismissed. 753 F. Supp. 3d at 94–96. But the *Mazza* complaint and briefing suffered from two fatal flaws on that front: (i) the complaint failed to allege "a history of recurring rights violations" or even a single other "instance of an unconstitutional withholding of evidence"; and, (ii) the briefing "ma[de] no assertion" that the risk of a rights "violation is 'so obvious' that a failure to train is self-evident." *Id*. at 95–96. Mr. Kamara's complaint and briefing suffer from neither flaw. *See* Sections II.B.i) (pattern of violations) and II.B.ii) (obviousness).

[28] There is a second step, which asks whether the Federal Rule is "valid." *Id*. at 198. The Rules we cite are valid. *Id*. at 199 (citing cases); *Albright v. Christensen*, 24 F.4th 1039, 1048 (6th Cir. 2022); *Pledger v. Lynch*, 5 F.4th 511, 521 (4th Cir. 2021).

pre-suit notice requirement conflicts with Rule 3 (as well as Rule 8), and is therefore inapplicable in federal court); *Tederick v. LoanCare, LLC*, No. 22-cv-394, 2023 WL 6465404, at *9–10 (E.D. Va. Oct. 2, 2023) (same, for West Virginia's pre-suit notice requirement).

Although the conflict is clearest with Rule 3, just as in *Berk*, "Rule 12 reinforces the point." 607 U.S. at 193. Failing to have presented a claim in writing is *not* a permissible ground for relief on a Rule 12 motion, *id.*, so if the state law requires dismissal—as the City asserts it does—that reinforces the conflict between the state law and the Federal Rules. The presentment requirement also conflicts with Rule 4, which specifies the requirements for notifying a defendant about the existence and substance of a civil action—and requires only service of a summons and a copy of the complaint, *after* the complaint is filed. Fed. R. Civ. P. 4. *See Pledger v. Lynch*, 5 F.4th 511, 522 (4th Cir. 2021) (holding that West Virginia's pre-suit notice requirement conflicts with Rule 4 (as well as Rules 8 and 12), and is therefore inapplicable in federal court).[29] Because the presentment requirement conflicts with the Federal Rules, it does not apply in this case.

### B.    Mr. Kamara satisfied the presentment requirement.

In any event, Mr. Kamara timely presented his claim. The statute requires presentment "within two years after the date upon which the cause of action arose." M.G.L. c. 258, § 4. The City argues that Mr. Kamara's cause of action arose in 1991 or 2021, so a 2024 presentment was too late. Dkt. 20 at 17. The City is wrong. Notably, the City acknowledges that, under the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), Mr. Kamara's *federal* causes of action did not arise until

---

[29] The Court will note that the cases we cited found that pre-suit notice requirements conflicted with *several* Federal Rules, not just one. That's unsurprising, since a conflict exists even when a Federal Rule does not *specifically* answer the question, but nonetheless has a scope "sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue." *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987) (cleaned up); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (holding that a Federal Rule providing a "one-size-fits-all formula" displaced a more specific state rule addressing the same question).

his conviction was overturned in 2023. Dkt. 20 at 4–5.[30] But Massachusetts has the same rule: claims like Mr. Kamara's, which challenge the propriety of a criminal conviction, can't be brought until the conviction is invalidated. *Tinsley v. Town of Framingham*, 485 Mass. 760, 761 & n.3, 766 (2020); *Bradley v. Commonwealth*, 105 Mass. App. Ct. 1107 (2024), 2024 WL 5183154, *review denied*, 496 Mass. 1105 (2025). The plaintiff in *Tinsley* brought several claims, including negligence, false imprisonment, and more—but the analysis focused not on the label, but on the substance: if the claim depended on the plaintiff being innocent, it could not proceed while the criminal conviction remained intact. 485 Mass. at 762, 765 n.10, 767–72.[31] Accordingly, Mr. Kamara's causes of action did not arise until his conviction was overturned and the prosecution entered a *nolle prosequi*, both of which happened in March 2023. ¶¶ 126–27. He presented his claim to the City less than a year later, ¶ 24, satisfying the presentment requirement.

We acknowledge that the First Circuit's opinion in *Haley* is to the contrary. *Haley* was decided before *Tinsley*, so only *assumed*—somewhat skeptically—that the plaintiff's cause of action did not arise until his conviction was overturned. 657 F.3d at 54. But even under that assumption, the First Circuit held that the plaintiff was required to present his claim within two years of the underlying police misconduct—decades before his cause of action arose. *Haley*, 657 F.3d at 54. On this question of state law, *Haley* was wrong: its rule directly conflicts with the text of the presentment statute, which requires presentment be made "within two years after *the date*

---

[30] *See also McDonough v. Smith*, 588 U.S. 109, 115, 120 (2019) (holding that a "fabricated-evidence" cause of action did not arise until the criminal defendant was acquitted, noting "the practical considerations" that underlie the delayed-accrual rule, and rejecting a contrary rule "which would impose a ticking limitations clock on criminal defendants as soon as they become aware that fabricated evidence has been used against them").

[31] Focusing on the substance, not the label, is the same approach the U.S. Supreme Court used in a case decided just last week, which held that no matter what label a convicted person puts on his claim, if the claim substantively asserts that he is innocent, it is a collateral attack on his conviction. *Fernandez v. United States*, No. 24-556, 2026 WL 1485476, at *9 n.6 (U.S. May 28, 2026).

*upon which the cause of action arose.*" M.G.L. c. 258, § 4 (emphasis added).[32] The *Haley* court

erred by relying on *George v. Town of Saugus*, 394 Mass. 40 (1985), a case that was *not* a wrongful-

conviction case and therefore did not involve a cause of action that arises long after the underlying

misconduct. *George* was about a plaintiff who had been a minor when her cause of action arose.

She argued that since a statute relieved minors from *statutes of limitations*, courts should craft a

rule relieving her from the *presentment* obligation. *Id*. at 41–42. But there was no *statute* providing

relief from presentment. And the statute that provided relief from statutes of limitations explicitly

---

[32] We tried to determine whether *Haley*'s resolution of this state-law issue is binding on this Court, and candidly found no clear answer. While a few district courts in this Circuit have considered themselves bound by the First Circuit's view of state law, those cases cite *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 544 (1st Cir. 1957), which holds no such thing. The panel in *Esquire* merely wrote that it would follow the result from an earlier panel because there had been no new opinion issued by the state's highest court. *Id*. The panel did not hold that it was *bound* to follow that earlier opinion (a matter of internal operating procedure), much less that lower federal courts were bound to do so (a matter of vertical *stare decisis*). Several district courts, around the country, have held they are *not* bound by Circuit court resolutions of state-law issues. *E.g.*, *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869, 892 n.7 (N.D. Cal. 2024); *Walton v. Grammer Indus., Inc.*, No. 20-12298, 2022 WL 22883464, at *5 (E.D. Mich. Oct. 5, 2022) (writing that Sixth Circuit opinions are "not binding on this question of Pennsylvania state law"); *McDonald v. Davis Cnty.*, No. 20-cv-00136, 2021 WL 2940604, at *4 (D. Utah July 13, 2021) (writing that Tenth Circuit opinions are "not binding with respect to this state law issue").

*Haley* was decided in 2011, before federal courts viewed a statute's text as near-dispositive on questions of statutory interpretation. The opinion gave no weight to the plain text setting the deadline at two years from when the "cause of action arose," and instead discussed whether there was a "sensible basis" for the result. 657 F.3d at 54–55. We believe the First Circuit would reach a different result today, given that *Tinsley* now makes clear that causes of action that challenge an underlying conviction do not arise until the conviction is overturned, and given the plain text of the presentment statute. Because there is no clear law binding this Court to *Haley's* view of state law, we respectfully ask this Court to reach the contrary, but correct, result. Of course, if there is clear law binding this Court to follow *Haley* on questions of state law, we withdraw that request but preserve our arguments for appeal.

In any event, if the Court finds—as we believe it should—that Massachusetts's presentment requirement conflicts with the Federal Rules, then the requirement doesn't apply in federal court and the Court need not decide whether it can depart from *Haley's* incorrect application of the state-law requirement. (The parties in *Haley* did not brief, and the court did not discuss, whether the presentment requirement conflicted with the Federal Rules.)

23

*did not change* the date on which a minor's cause of action arose. *Id*. at 41 n.1. Because the presentment statute is tied to the date on which a cause of action arose, the result in *George*—that presentment was not satisfied, *id*. at 42–44—was a straightforward application of the statute's text. *George* has no application because Mr. Kamara is not asking for a judicially crafted exception. Under a straightforward application of *Tinsley* and the presentment statute, Mr. Kamara has satisfied all requirements: his cause of action arose when his conviction was overturned, and he presented his claim within a year of that date.

## IV.   The City's arguments about "*respondeat superior*" are misplaced and wrong.

In Count XII, Mr. Kamara asserted that, under the doctrine of *respondeat superior*, the City is vicariously liable for the torts the individual Defendants committed against Mr. Kamara. ¶¶ 282–86. Mr. Kamara explicitly stated that his *respondeat superior* theory does not apply to his federal claims, his state-law claim for malicious prosecution (Count VI), or his state-law claim for intentional infliction of emotional distress (Count VIII). ¶¶ 285–86. The theory applies to Count VII (negligence), Count IX (negligent infliction of emotional distress), and Count X (violation of the Massachusetts Civil Rights Act ("MCRA")).[33]

The City addressed *respondeat superior* in two paragraphs on pages 18–19 of its brief. Nowhere does the City discuss Count VII (negligence) or Count IX (negligent infliction of

---

[33] In a footnote, the City suggests bringing claims pursuant to *respondeat superior* is different from bringing them pursuant to the Massachusetts Tort Claims Act. Dkt. 20 at 16 n.45. But courts consider those labels synonymous. *See, e.g.*, *Brown*, 2025 WL 2420967, at *5; *Coelho v. Nova*, No. 21-cv-11871, 2023 WL 12123341, at *10 (D. Mass. Sept. 8, 2023); *Abernathy v. Anderson*, 395 F. Supp. 3d 123, 131–32 (D. Mass. 2019); *McGrath*, 169 F. Supp. 3d at 255–56. Even if the City were correct, federal courts do not dismiss complaints based on the labels given to legal claims. *Mazza*, 753 F. Supp. 3d at 94 ("It is not fatal to a complaint that a legal theory has been mischaracterized." (quoting *Torres-Ramirez v. Bermudez Garcia*, 898 F.2d 224, 226–27 (1st Cir. 1990))). Rule 8 requires only a short and plain statement that puts the defendant on notice, and that standard has been met, as evidenced by the City's own footnote.

emotional distress), conceding that it *is* vicariously liable for these torts. And the City's first paragraph addresses the federal claims, intentional infliction of emotional distress, and malicious prosecution—exactly the claims Mr. Kamara is *not* pursuing on a theory of *respondeat superior*.

In its second and final paragraph, the City asserts that *respondeat superior* is unavailable for the MCRA claim (Count X). But the City is wrong. The case law is clear that employers can be liable, under *respondeat superior*, for their employees' violations of the MCRA. *E.g.*, *Pettiford v. Branded Mgmt. Grp., LLC*, 104 Mass. App. Ct. 287, 291, 296–98 (2024); *Sarvis v. Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 96–97 (1999). The City doesn't dispute this, nor does it dispute that the individual detectives are subject to the MCRA. That settles the issue.

The cases cited by the City all dismissed *respondeat superior* claims by asking whether a municipality is a "person" under MCRA. But that's the wrong question where, as here, a plaintiff sues natural persons directly under the statute and only sues the municipality *vicariously*, as the employer. *Monell*, for example, gave opposite answers to those two distinct questions. 436 U.S. at 690.[34] Because the City's misplaced "not-a-person" argument is the only basis it offers for dismissing the MCRA claim, the City's motion must be denied as to Count X.

**CONCLUSION**

For the reasons stated above, the City's motion should be denied in its entirety.

---

[34] Even on the irrelevant question of whether municipalities are "persons" under the MCRA, the City's cases rely on a single decision from a state appellate court, *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 592 (2001). The highest state court previously granted discretionary review to decide the issue—suggesting the issue is not settled—but then disposed of the case on other grounds. *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 391 (1996).

25

Dated: June 5, 2026                     Respectfully submitted,

s/ Katie McCarthy
Katie McCarthy*
Anna Benvenutti Hoffmann (BBO #660595)
Nick Brustin*
Katherine Cion*
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014
Phone: (212) 965-9081
katie@nsbhf.com
kcion@nsbhf.com
anna@nsbhf.com
nick@nsbhf.com

s/ John J. Barter
John J. Barter (BBO #032150)
83 Atlantic Avenue, Suite 300
Boston, MA 02110
barterj@msn.com
Phone: (617) 367-2545

s/ Amy M. Belger
Amy M. Belger (BBO #629694)
2125 Washington Street
Holliston, MA 01746
appellatedefender@gmail.com
Phone: (917) 558-3120

*Attorneys for Plaintiff Barry Kamara*
**Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2026, a true and accurate copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

s/ Katie McCarthy
Katie McCarthy
Attorney for Plaintiff
